**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARIA T. VULLO, in her official capacity as
Superintendent of the New York State
Department of Financial Services,

             Plaintiff,

    v.

OFFICE OF THE COMPTROLLER OF THE
CURRENCY and KEITH A. NOREIKA, in his
official capacity as Acting U.S. Comptroller of
the Currency,

             Defendants.

17 Civ. 3574 (NRB)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2761
Facsimile: (212) 637-2786

CHRISTOPHER CONNOLLY
Assistant United States Attorney
    —Of Counsel—

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

I.      OCC's Chartering Authority............................................................................2

II.     The Alleged "Fintech Charter Decision" ..........................................................3

        A.      The 2003 Regulatory Amendment.......................................................4

        B.      OCC's Public Statements on Issuing Charters to Fintech Companies ...................4

III.    Acting Comptroller Noreika's Speech on July 19, 2017 .................................5

ARGUMENT .............................................................................................................6

I.      THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER
        DFS'S CLAIMS...............................................................................................6

        A.      DFS Lacks Standing Because It Has Not Suffered an Injury-In-Fact ...................6

        B.      The Matter Is Not Ripe for Judicial Review ........................................8

        C.      Any Challenge to OCC's 2003 Amendment to Section 5.20(e)(1) Is
                Time-Barred ......................................................................................9

II.     THE COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF
        MAY BE GRANTED ......................................................................................10

        A.      DFS Fails to State a Claim Under the APA Because There Is No
                "Final Agency Action" ....................................................................10

                1.      OCC Has Not Completed Its Decision-Making Process ..........................11

                2.      OCC's Actions Have Not Affected Rights or Obligations or Resulted
                        in Legal Consequences ........................................................12

        B.      OCC's Interpretation of the Ambiguous Term "The Business of Banking"
                in the National Bank Act Is Entitled to Deference .................................13

                1.      Because the Statutory Text Is Ambiguous, OCC Has Discretion to
                        Reasonably Interpret It..............................................................14

a. In *NationsBank*, the Supreme Court Recognized OCC's Authority to Interpret the Ambiguous Term "Business of Banking" ......................................................................................... 15

b. The D.C. Circuit Has Confirmed OCC's Authority to Issue a Limited Purpose National Bank Charter ....................................... 17

2. OCC Reasonably Interpreted the Statutory Term "Business of Banking" by Reference to Three Core Banking Activities Identified in the National Bank Act .......................................................................... 19

C. OCC's Has Statutory and Constitutional Authority to Issue a 5.20(E)(1) Charter ............................................................................... 21

1. The Limited Judicial Authority Cited by DFS Is Not Entitled to Weight ................................................................................................... 21

2. The Historical Understanding of "Bank" Is Consistent with the OCC's Interpretation ....................................................................................... 22

3. Neither Section 5.20(e)(1) Nor Any Charter Issued Under Section 5.20(e)(1) in the Future Would Violate the Tenth Amendment ............... 23

CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE**

*Abbott Labs. v. Gardner*,
 387 U.S. 136 (1967) ............................................................... 9, 11

*Am. Ins. Ass'n v. Clarke*,
 865 F.2d 278 (D.C. Cir. 1988) ............................................. 17

*Arnold Tours, Inc. v. Camp*,
 472 F.2d 427 (1st Cir. 1972) ............................................... 17

*AT&T v. EEOC*,
 270 F.3d 973 (D.C. Cir. 2001) ......................................... 11, 12

*Barnett Bank of Marion Co. v. Nelson*,
 517 U.S. 25 (1996) ............................................................... 23

*Bennett v. Spear*,
 520 U.S. 154 (1997) ......................................................... 11, 12

*Chevron, Inc. v. NRDC, Inc.*,
 467 U.S. 837 (1984) ......................................................... 13, 14

*Clarke v. Sec. Indus. Ass'n*,
 479 U.S. 388 (1987) ......................................................... 13, 20

*Cuomo v. Clearing House, Ass'n, LLC*,
 557 U.S. 519 (2009) ........................................................... 13

*Cuzzo Speed Tech., LLC v. Lee*,
 136 S. Ct. 2131 (2016) ....................................................... 14

*Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*,
 458 U.S. 141 (1982) ........................................................... 23

*First Nat'l Bank in Plant City v. Dickinson*,
 396 U.S. 122 (1969) ........................................................... 21

*Franklin Nat'l Bank v. New York*,
 347 U.S. (1954) .................................................................. 23

*Harris v. FAA*,
 353 F.3d 1006 (D.C. Cir. 2004) ........................................ 10

*Independent Bankers Ass'n of America v. Conover,*
 1985 U.S. Dist. Lexis 22529 (M.D. Fla. 1985)................................................. 22

*Indep. Cmty. Bankers Ass'n of South Dakota, Inc. v. Bd. of Governors of the Fed.*
 *Reserve Sys.,*
 820 F.2d 428 (D.C. Cir. 1987), *cert denied,* 484 U.S. 1004 (1988) ........................... 18, 19

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992)................................................................................ 7

*M&M Leasing Corp. v. Seattle First Nat'l Bank,*
 563 F.2d 1377 (9th Cir. 1977) .................................................................. 17

*Makarova v. United States,*
 201 F.3d 110 (2d Cir. 2000)...................................................................... 3

*Marchi v. Bd. of Coop. Educ. Servs.,*
 173 F.3d 469 (2d Cir.1999)........................................................................ 9

*N.Y. Civil Liberties Union v. Grandeau,*
 528 F.3d 122 (2d Cir. 2008)...................................................................... 9

*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,*
 513 U.S. 251 (1995)........................................................................ 13, 15, 16

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
 538 U.S. 803 (2003)................................................................................ 8

*Nat'l State Bank of Elizabeth, N.J. v. Smith,*
 591 F.2d 223 (3d Cir. 1979)................................................................. 21, 22

*Oconus DOD Emp. Rotation Action Grp. v. Cohen,*
 140 F. Supp. 2d 37 (D.D.C. 2001) ............................................................ 11

*Oulton v. German Sav. & Loan Soc.,*
 84 U.S. 109 (1872)................................................................................ 23

*Peoples Nat'l Bank v. OCC,*
 362 F.3d 333 (5th Cir. 2004) .................................................................. 13

*Selevan v. N.Y. Thruway Auth.,*
 584 F.3d 82 (2d Cir 2009)........................................................................ 7

*Sharkey v. Quarantillo,*
 541 F.3d 75 (2d Cir. 2008)...................................................................... 11

*Simmonds v. INS*,
    326 F.3d 351 (2d Cir. 2003)............................................................................................ 9

*Smiley v. Citibank (South Dakota)*,
    517 U.S. 735 (1996)............................................................................................ 13, 23

*Spannaus v. U.S. Dep't of Justice*,
    824 F.2d 52 (D.C. Cir. 1987).......................................................................... 10

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016).......................................................................................... 8

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)........................................................................................ 6, 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................ 3

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
    231 F.3d 20 (D.C. Cir. 2000)............................................................................ 7

*U.S. v. Mead Corp.*,
    533 U.S. 218 (2001).......................................................................................... 14

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007).............................................................................................. 23

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)............................................................................................ 8

## STATUTES

5 U.S.C. § 704.................................................................................................... 11

12 U.S.C. § 1...................................................................................................... 2

12 U.S.C. § 1(a).................................................................................................. 2

12 U.S.C. § 21.............................................................................................. 2, 14

12 U.S.C. § 24(Seventh)...................................................................................... 15

12 U.S.C. § 26.............................................................................................. 2, 14

12 U.S.C. § 27........................................................................................... 2, 14, 15

12 U.S.C. § 36 ........................................................................................................... 19, 20

12 U.S.C. § 81 ................................................................................................................. 20

12 U.S.C. § 85 ................................................................................................................... 7

12 U.S.C. § 2401(a) ........................................................................................................ 10

**RULES**

Fed. R. Civ. P. 12(b)(1) ..................................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ..................................................................................................... 1

**REGULATIONS**

12 C.F.R. Part 5 ................................................................................................................. 2

12 C.F.R. §5.20(e)(1) ............................................................................................ 1, 15, 19

68 Fed. Reg. 6363 (Feb. 7, 2003) ..................................................................................... 4

68 Fed. Reg. 70122 (Dec. 17, 2003) ........................................................................... 4, 10

## PRELIMINARY STATEMENT

Defendants the Office of the Comptroller of the Currency and Keith A. Noreika, in his official capacity as Acting Comptroller of the Currency (together, "defendants" or "OCC"), by their attorney, Joon H. Kim, Acting United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss the Complaint (ECF No. 10) ("Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction, and 12(b)(6), for failure to state a claim on which relief may be granted.

The New York State Department of Financial Services ("DFS") seeks to remedy speculative harms that it alleges may arise from future action by OCC—action that OCC may never take. DFS seeks to preemptively halt OCC from considering applications for a particular form of bank charter — a Special Purpose National Bank Charter ("SPNB") — from financial technology ("fintech") companies.

DFS lacks standing because OCC's regulation addressing the chartering of SPNBs, 12 C.F.R. §5.20(e)(1), has resulted in no injury-in-fact. OCC has not reached a final decision on whether it will offer the specific type of national bank charter that is being challenged—a charter for an SPNB that does not take deposits and conducts activities other than fiduciary activities (a "5.20(e)(1) Charter"). Because, as DFS acknowledges, no 5.20(e)(1) Charter has been issued, none of the allegations contained in the Complaint presents either a justiciable case or controversy under the Constitution or a reviewable final agency action under the Administrative Procedure Act ("APA"). Moreover, the Court may also dismiss DFS's facial challenge to 12 C.F.R. § 5.20(e)(1) as untimely. In the absence of an issued 5.20(e)(1) Charter, DFS's premature challenge is necessarily limited to OCC's amendment of Section 5.20(e)(1) in 2003. Any cause of action

seeking to review the 2003 regulatory amendment would have accrued in January of 2004, when the relevant regulatory provisions became effective, and is now time-barred.

Finally, should the Court reach the merits of OCC's authority to promulgate 12 C.F.R. § 5.20(e)(1) and issue charters to non-depository fintech companies pursuant to that regulation, the Complaint should be dismissed for failure to state a claim.  Section 5.20(e)(1) represents a reasonable interpretation of OCC's statutory authority under the National Bank Act.  OCC's authoritative interpretation of the ambiguous statutory term "the business of banking" is therefore entitled to deference under the *Chevron* framework.

## BACKGROUND

### I.    OCC's Chartering Authority

OCC is an independent bureau of the U.S. Department of the Treasury with primary supervisory responsibility over national banks.  *See* 12 U.S.C. § 1 *et seq.*  It is charged with assuring that national banks (and other institutions under its jurisdiction) operate in a safe and sound manner in compliance with applicable laws and regulations, and that they offer fair access to financial services and provide fair treatment of customers.  *See* 12 U.S.C. § 1(a).  OCC's activities in furtherance of its mission include determining whether to grant new national bank charters to associations formed to carry out the "business of banking."  *See, e.g.*, 12 U.S.C. §§ 21, 26, 27.  Under Section 27(a), OCC may grant a charter "[i]f . . . it appears that such association is lawfully entitled to commence the business of banking."

OCC's chartering regulations, *see* 12 C.F.R. Part 5, establish a thorough and public process for receiving and considering applications for national bank charters.  OCC may charter new national banks to undertake either "full service" or more limited "special purpose" operations.  *See* Comptroller's Licensing Manual, Charters (Sept. 2016) at 1, *available at* https://www.occ.treas.gov/publications/publications-by-type/licensing-manuals/charters.pdf  (last

visited Aug. 16, 2017).[1]  OCC charters various types of SPNBs with limited purpose operations. *Id.*  In contrast to full-service banks, special purpose banks may offer a small number of products, target a limited customer base, or have narrowly targeted business plans.  *Id.* at 50.  Banks with special purpose operations include "trust banks, credit card banks, bankers' banks, community development banks, cash management banks, and other[s] . . . ."  *Id.* at 1.  The application process is initiated by publishing a newspaper notice, followed by public comment, and OCC then reviews applications on a case-by-case basis to determine whether statutory and regulatory requirements are met.  *Id.* at 1, 4.  If the application is successful, OCC grants charters in two steps: preliminary conditional approval and then final approval.  *Id* at 3.

## II.    The Alleged "Fintech Charter Decision"

The issue whether OCC should use its chartering authority to bring fintechs into the national banking system emerged out of a broader initiative, launched in 2015 by former Comptroller of the Currency Thomas J. Curry, to examine how OCC could best support responsible innovation in the financial services industry.  *See* Keith A. Noreika, Acting Comptroller, the Office of the Comptroller of the Currency, Exchequer Club Remarks (July 19, 2017)  ("Exchequer  Speech")  at  3,  *available  at*  https://occ.treas.gov/news-issuances/speeches/2017/pub-speech-2017-82.pdf (last visited Aug. 16, 2017).  In an attempt to manufacture a final agency action that would be subject to judicial review, *i.e.* a final decision by

---

[1]     In resolving motions to dismiss for lack of subject-matter jurisdiction, courts may refer to evidence outside the pleadings.  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In resolving motions to dismiss for failure to state a claim on which relief may be granted, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Accordingly, although neither the Comptroller's Licensing Manual nor the transcript of Acting Comptroller Noreika's remarks at the Exchequer Club on July 19, 2017 (cited *infra*) are appended to the Complaint or incorporated by reference, the Court may nonetheless consider them for purposes of OCC's motion to dismiss.

OCC to grant a 5.20(e)(1) Charter to non-depository fintech companies, DFS points to OCC's amendment of Section 5.20(e)(1) in 2003, and three recent OCC public statements; together, it refers to these as the "Fintech Charter Decision." Compl. ¶¶ 2, 28-39.

### A.      The 2003 Regulatory Amendment

In 2003, OCC amended its chartering regulations to clarify its authority to charter SPNBs. 68 Fed. Reg. 70122 (Dec. 17, 2003).  OCC proposed revising Section 5.20(e)(1) to provide that a newly organized bank "may be a special purpose bank that limits its activities to fiduciary activities or to any other activities within the business of banking."  68 Fed. Reg. 6363, 6373 (Feb. 7, 2003). In response to commenters' concerns that the proposed special purpose charter had the potential to extend to activities "only loosely related to banking," 68 Fed. Reg. at 70126, the final rule stated that "[a] special purpose bank that conducts activities other than fiduciary activities must conduct at least one of the following three core banking functions: receiving deposits; paying checks; or lending money." *Id.* at 70129.  OCC explained that these three core banking functions were based on related language in 12 U.S.C. § 36, "which identifies activities that cause a facility to be considered a bank branch." *Id.* at 70126.  Since this amendment, OCC has not used 12 C.F.R. § 5.20(e)(1) to grant an SPNB charter with the characteristics identified in the Complaint, *i.e.,* a charter for a bank carrying out non-fiduciary activities that does not receive deposits.

### B.      OCC's Public Statements on Issuing Charters to Fintech Companies

In addition to the amendment of the chartering regulation in 2003, DFS identifies three public statements by OCC that it claims demonstrate that the agency has reached a final decision to grant 5.20(e)(1) Charters.  First, in a speech at the LendIT USA conference in New York on March 6, 2017 (ECF No. 10-10) ("Curry Speech"), then-Comptroller Curry noted that OCC had received "more than 100 thoughtful comments" on a white paper the agency had published three

4

months earlier concerning the potential issuance of SPNB charters to fintech companies.  *Id.* at 5; *see also Exploring Special Purpose National Bank Charters for Fintech Companies* (Dec. 2016) (ECF No. 10-2) ("SPNB White Paper").  Comptroller Curry stated that OCC was developing a supplement to its existing Licensing Manual to "clarify our approach to evaluating [charter] applications from fintech companies."  Curry Speech at 5.  Second, on March 15, 2017, OCC published *OCC Summary of Comments and Explanatory Statement: Special Purpose National Bank Charters for Financial Technology Companies* (ECF No. 10-8) ("Explanatory Statement"). The Explanatory Statement reviewed the public comments on the SPNB White Paper on topics such as consumer protection and supervisory standards.  *Id.*  Simultaneously, OCC issued the third statement, a draft supplement to the Comptroller's Licensing Manual for public comment, titled *Evaluating Charter Applications from Financial Technology Companies* (Mar. 2017) (ECF No. 10-9) ("Draft Supplement").  To date, OCC has not issued a final supplement to its Licensing Manual.

## III.  Acting Comptroller Noreika's Speech on July 19, 2017

Comptroller Curry was succeeded by defendant Noreika on May 6, 2017.  In a speech to the Exchequer Club on July 19, 2017, Acting Comptroller Noreika addressed OCC's ongoing efforts in the area of "responsible innovation" and the possibility of national bank charters for fintech companies.  He explained that OCC was considering the "idea of granting national bank charters to fintech companies that are engaged in the business of banking and requiring them to meet the high standards for receiving a charter."  Exchequer Speech at 4.  He indicated, however, that OCC had not received any applications for 5.20(e)(1) Charters, and that OCC's future course regarding any such charters remains undecided:

> [A]t this point the OCC has not determined whether it will actually accept or act upon applications from nondepository fintech companies for special

purpose national bank charters that rely upon [Section 5.20(e)(1)].  And, to
be clear, we have not received, nor are we evaluating, any such applications
from nondepository fintech companies.

*Id.* at 9.  Further, Acting Comptroller Noreika suggested that OCC might ultimately decide not to

issue 5.20(e)(1) Charters for fintech companies—for example, he explained that OCC might

instead support fintech innovation using full-service national bank and federal savings association

charters or other types of SPNB charters.  *Id.*

## ARGUMENT

## I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER DFS'S CLAIMS

### A.    DFS Lacks Standing Because It Has Not Suffered an Injury-In-Fact

At the threshold, the Court should dismiss the Complaint because DFS cannot show that it

has the standing necessary to meet the "case or controversy" requirement of Article III of the

Constitution.  Because neither the relevant provisions of Section 5.20(e)(1) nor the series of OCC

public statements identified in the Complaint has resulted in any cognizable harm to DFS, there is

no injury-in-fact that could be redressed by the requested relief.

The "irreducible constitutional minimum" for standing contains three requirements.  *Steel*

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998).  "First and foremost," a plaintiff

must allege an "injury in fact—a harm suffered by the plaintiff that is concrete and actual or

imminent, not conjectural or hypothetical."  *Id*. at 103 (internal quotations omitted).  "Second,

there must be causation—a fairly traceable connection between the plaintiff's injury and the

complained-of conduct of the defendant."  *Id.*  "And third, there must be redressability—a

likelihood that the requested relief will redress the alleged injury."  *Id.*  "This triad of injury in fact,

causation and redressability constitutes the core of Article III's case-or-controversy requirement,

and the party invoking federal jurisdiction bears the burden of establishing its existence."  *Id.* at

103-04 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *accord Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 89 (2d Cir 2009). "A deficiency on any one of the three prongs suffices to defeat standing." *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).

Here, DFS cannot establish standing because it cannot point to any injury-in-fact that it has suffered as a result of OCC's purported actions. Indeed, all of the potential injuries that DFS identifies in its Complaint are future-oriented and speculative, and therefore insufficient to confer standing. *See Lujan*, 504 U.S. at 561 (injury must be "likely" as opposed to merely "speculative"). For example, DFS alleges that:

- While the "full scope of regulatory disruption is difficult to ascertain," "federal preemption claims will surely proliferate," Compl. ¶ 40;

- Money transmitters currently licensed by New York could qualify for a SPNB charter removing them from the customer "financial protections otherwise guaranteed by New York" *id.* at ¶ 42-43;

- The interest rates charged by fintech national bank charters would be governed by the National Bank Act, 12 U.S.C. § 85, making applicable the usury rates of states other than New York, *id.* at ¶ 43;

- The advent of the SPNB charter "could realistically lead" to the "proliferation of prohibited payday lending by out-of-state OCC chartered entities," *id.* at ¶¶ 44-45;

- The SPNB-chartered entities would be exempt from existing federal standards of safety and soundness, liquidity and capitalization, *id.* at ¶ 46;

- The SPNB charter could cause fintech firms to choose a federal charter rather than a state charter, causing a decline in the assessments that fund DFS, *id.* at ¶¶ 47-48.

Each of these projected future harms shares the same fatal defect for standing purposes: the alleged effect is inchoate. Unless and until OCC issues a 5.20(e)(1) Charter, none of the harms referenced by DFS can materialize or be identified with the requisite certainty; the alleged harms are now merely hypothetical. "A 'concrete' injury must be *de facto*; that is, it must actually exist."

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  DFS has averred no such existing injury.  "Allegations of possible future injury do not satisfy the requirements of Article III.  A threatened injury must be 'certainly impending' to constitute injury in fact."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Put simply, DFS cannot establish standing because OCC has yet to take any relevant action that could have a concrete effect of any kind.  As DFS acknowledges, no Section 5.20(e)(1) Charter has been issued to a non-depository fintech company.  Compl. ¶¶ 24, 26.  OCC has not even received any applications for such a charter.  Exchequer Speech at 9.  No final procedures for processing such an application by OCC are in place—the proposed supplement to the chartering manual remains in draft form.  *See generally* Draft Supplement.  Each of OCC's public statements identified in the Complaint were part of ongoing policy development that is not final.  And as highlighted by Acting Comptroller Noreika's speech to the Exchequer Club, there is no current or near-term prospect that an application for a 5.20(e)(1) Charter will come under active agency consideration, and the possibility that an applicant would actually commence the business of banking is even more remote.  Exchequer Speech at 9.  Accordingly, DFS cannot meet its burden of showing a "concrete" "actual or imminent" injury-in-fact, *Citizens for a Better Env't*, 523 U.S. at 103, and consequently cannot show causation or redressability.  Because DFS cannot satisfy any of the requirements for standing, the Complaint should be dismissed.

**B.     The Matter Is Not Ripe for Judicial Review**

Relatedly, the absence of OCC action means that this matter is not yet ripe for judicial review.  Even where standing exists under Article III, there may still be "prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  Courts assess the prudential ripeness of a case based on a two-prong inquiry: "'[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court

consideration.'"  *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131-32 (2d Cir. 2008) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).  DFS cannot satisfy either prong of this test.

The first prong, fitness, turns on, among other things, "whether the issues sought to be adjudicated are contingent on future events or may never occur."  *Grandeau*, 528 F.3d at 132 (citation and quotation marks omitted).  As explained above, OCC's inquiry regarding whether to offer a 5.20(e)(1) Charter is ongoing.  Moreover, OCC has not decided whether it will accept applications for 5.20(e)(1) Charters, making the policy initiative unfit for review.  *See id.* ("None of these [purported indicia of a final agency action] suffices to establish the existence of a Commission policy that is fit for judicial review."); *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir.1999) (claim unripe when the court "would be forced to guess at how [the defendant] might apply the [challenged] directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical").

The second prong, hardship, turns on "whether the challenged action creates a direct and immediate dilemma for the parties."  *Marchi,* 173 F.3d at 478.  "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship."  *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003).  Here, for the reasons addressed above, DFS will not suffer any immediate or significant hardship if this Court were to delay review of this matter because any injuries it can identify are contingent on future actions that OCC might or might not take.  In the absence of any concrete hardship, this matter is not yet ripe for judicial review.

### C.    Any Challenge to OCC's 2003 Amendment to Section 5.20(e)(1) Is Time-Barred

Finally, to the extent DFS's claims present a facial challenge to Section 5.20(e)(1), that cause of action is time-barred by the statute of limitations applicable to civil actions against federal

agencies.  "Except as provided [in the Contract Disputes Act of 1978], every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a).  A cause of action under the APA accrues on the date of the final agency action.  *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004).  "Unlike an ordinary statute of limitations, § 2401(a) is a jurisdictional condition attached to the government's waiver of sovereign immunity, and as such must be strictly construed."  *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987).

DFS states, in its July 27, 2017, letter to the Court, that OCC "cannot, in good faith, claim that this regulation is not a final rule subject to legal challenge."  ECF No. 16 at 2.  Insofar as the adoption of the amendments to Section 5.20(e)(1) constitutes a final agency action that DFS seeks to challenge here, any cause of action would have accrued on January 16, 2004, when the Final Rule became effective.  68 Fed. Reg. 70122 (Dec. 17, 2003).  Accordingly, the time for filing a facial challenge to the regulation expired on January 16, 2010.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED

### A.   DFS Fails to State a Claim Under the APA Because There Is No "Final Agency Action"

Because OCC has not issued any 5.20(e)(1) Charters, no "final agency action" exists that could give rise to a claim under the APA.[2]  The OCC "actions" that DFS characterizes as the "Fintech Charter Decision" are, at bottom, a collection of non-final policy statements and solicitations for input from the public that, whether considered separately or collectively, do not

---

[2]    It is unclear whether DFS is relying on the APA as a basis for review.  It cites the APA as a basis for jurisdiction, Compl. ¶ 14, but does not invoke the APA as a cause of action in support of its claims for relief, *id.* ¶¶ 49-62.  Accordingly, DFS has alleged no procedural defects under the APA.

represent a "final agency action" subject to review.  Under the APA, judicial review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704; *Abbott Labs.*, 387 U.S. at 140.  Agency action is final when it satisfies the two-part test set forth in *Bennett v. Spear*, 520 U.S. 154 (1997): it (1) "mark[s] the consummation of the agency's decision-making process," and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* at 177-78 (internal citations and quotation marks omitted).  Put another way, agency action is final when it states an "unequivocal position."  *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008) (citation and quotation marks omitted); *see also AT&T v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001).  Neither of the two requirements for finality is satisfied here.

### 1.    OCC Has Not Completed Its Decision-Making Process

DFS incorrectly alleges that OCC's March 2017 Explanatory Statement "made the agency's final decision" to receive applications for 5.20(e)(1) Charters from fintechs.  Compl. ¶¶ 34-38.  DFS also points to the Draft Supplement and Comptroller Curry's speech as further evidence of a "final decision."  *Id.*  But, contrary to DFS's claims, OCC's public statements merely demonstrate that the decision-making process is ongoing, and that there has been no final decision or imminent plan to consider any 5.20(e)(1) Charter applications.

The Explanatory Statement functioned to (1) "address key issues raised by commenters" on the SPNB White Paper, and (2) "explain[] the OCC's decision to issue [the Draft Supplement] for public comment."  Explanatory Statement at 1.  That OCC invited public comment on an "envisioned application process for fintech companies," *id.* at 1, 15, underscores that OCC's policy was (and is) still under development, *see, e.g.*, *Oconus DOD Emp. Rotation Action Grp. v. Cohen*, 140 F. Supp. 2d 37, 43-44 (D.D.C. 2001) (draft subchapter of manual not final agency action).

The Draft Supplement, meanwhile, is just that—a draft.  No final supplement has been published.  Moreover, nothing in Comptroller Curry's March 2017 speech supports reading the Explanatory Statement or Draft Supplement as documents expressing a final decision about the details of how or when the OCC may charter a fintech as a national bank.  Indeed, Comptroller Curry pointed out that "OCC is working to publish a supplement to our existing Licensing Manual."  Curry Speech at 5.

Fundamentally, as Acting Comptroller Noreika stated in his July 19, 2017 Exchequer Speech, no charter application has been received or acted upon.  Exchequer Speech at 9.  Acting Comptroller Noreika further confirmed the indeterminate status of the OCC's thinking on 5.20(e)(1) Charters: "[A]t this point the OCC has not determined whether it will actually accept or act upon applications from nondepository fintech companies for special purpose national bank charters that rely upon [Section 5.20(e)(1)]."  Exchequer Speech at 9.  As possible alternatives to a *de novo* 5.20(e)(1) Charter, Acting Comptroller Noreika suggested that OCC might consider addressing fintechs using full-service national bank and federal savings association charters, or recognized special purpose national bank charters, such as trust banks, banker's banks, and credit card banks.  *Id.*  Thus, by any measure, OCC has demonstrably not "made up its mind" about the issuance of 5.20(e)(1) Charters to nondepository fintech companies.  *AT&T*, 270 F.3d at 975.  Accordingly, there is no final agency action subject to review under the APA.

**2.     OCC's Actions Have Not Affected Rights or Obligations or Resulted in Legal Consequences**

In order to be final, an agency action must also have had an effect on rights or obligations or caused legal consequences.  *Bennett*, 520 U.S. at 177-78.  Here, even if OCC had reached a decision to consider 5.20(e)(1) Charter applications for fintech companies—which it has not—no legal consequences have flowed from OCC's actions to date because no 5.20(e)(1) Charter has

been issued.  *See Peoples Nat'l Bank v. OCC*, 362 F.3d 333 (5th Cir. 2004) (no reviewable final agency action when bank challenged OCC banking bulletin limiting the scope of OCC Ombudsman review of examination ratings, because bank did not use bulletin review process). DFS does not, and cannot, point to any concrete agency action with which it disagrees; rather, it "simply takes issue with the idea that" OCC might issue a 5.20(e)(1) Charter at some future date. *Id*. at 337.  DFS alleges several legal consequences that might in the future flow from the issuance of a 5.20(e)(1) Charter, but none that have actually materialized.  DFS's rights would therefore be adversely affected only "on the contingency of future administrative action," *id.*, that is, an actual grant of a 5.20(e)(1) Charter.  To date, however, no such charters have even preliminarily been granted.  Accordingly, any alleged chartering decision "should not be reviewed by a court until it has" actually occurred "and resulted in a final agency action."  *Id.*

### B.   OCC's Interpretation of the Ambiguous Term "The Business of Banking" in the National Bank Act Is Entitled to Deference

Because the Court lacks subject-matter jurisdiction over DFS's claims, and because there is no final agency action subject to APA review, the Complaint should be dismissed without consideration of the merits.  But even if the Court were to reach the merits, the Complaint should be dismissed for failure to state a claim because, under the framework articulated in *Chevron, Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), Section 5.20(e)(1) represents a reasonable OCC interpretation of the undefined and ambiguous statutory term "business of banking."

 The Supreme Court has repeatedly applied the *Chevron* framework to OCC's interpretations of terms of the National Bank Act.  *Cuomo v. Clearing House, Ass'n, LLC*, 557 U.S. 519, 525 (2009); *Smiley v. Citibank (South Dakota),* 517 U.S. 735, 739 (1996); *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995); *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403-04 (1987).  *Chevron* sets out two steps for evaluating an

agency's statutory interpretation.  "Where a statute is clear, the agency must follow the statute." *Cuzzo Speed Tech., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016).  "But where a statute leaves a 'gap' or is 'ambigu[ous],' we typically interpret it as granting the agency leeway to enact rules that are reasonable in light of the text, nature, and purpose of the statute."  *Id.* (citing *U.S. v. Mead Corp.*, 533 U.S. 218, 229 (2001)); *Chevron,* 467 U.S. at 843.

Because the National Bank Act does not provide a plain meaning for the term "business of banking," OCC has the "leeway" to address that ambiguity or "gap" in the statute by enacting rules that are "reasonable in light of the text, nature, and purpose of the statute."  *Cuzzo Speed Tech.,* 136 S. Ct. at 2142.  Applying this test, OCC's interpretation is reasonable and entitled to deference: OCC's interpretation is not precluded by statutory text, its reading is supported by judicial authority, and its interpretation of the term is consistent with the text, nature, and purpose of the statute.

> ### 1.      Because the Statutory Text Is Ambiguous, OCC Has Discretion to Reasonably Interpret It

An examination of the relevant text of the National Bank Act makes clear that, under the *Chevron* framework, the phrase "business of banking" is ambiguous, having no fixed meaning that precludes OCC's interpretation set forth in Section 5.20(e)(1).  The term "business of banking" appears in several National Bank Act provisions, without definition or textual elaboration that could add meaning.  *See* 12 U.S.C. §§ 21 ("Associations for carrying on the business of banking"); 24(Seventh) (dealing with bank powers); 26 (requirements to be complied with before an association may commence "the business of banking …."); and 27(b)(1) (the Comptroller of the Currency may issue a "certificate of authority to commence the business of banking" to [a bankers' bank]).  Section 27, the general chartering provision, states:

> If, upon a careful examination of the facts so reported, and of any other facts

> which may come to the knowledge of the Comptroller . . . it appears that such association is lawfully entitled to commence the *business of banking*, the Comptroller shall give to such association a certificate . . . that such association has complied with all the provisions required to be complied with before commencing the *business of banking* and that such association is authorized to commence such business.

12 U.S.C. § 27(a) (emphasis added).  The National Bank Act does not set forth any mandatory activities that must be performed in order for a bank to be engaged in the "business of banking." Indeed, the text in general is permissive and therefore consistent with an expansive grant of discretion in the Comptroller to assign content to the phrase.  Accordingly, there is nothing in the text of the National Bank Act that precludes the OCC's interpretation codified at 12 C.F.R. § 5.20(e)(1).

### a.      In *NationsBank*, the Supreme Court Recognized OCC's Authority to Interpret the Ambiguous Term "Business of Banking"

The Supreme Court has afforded *Chevron* deference to an OCC interpretation of a statutory phrase embracing "the business of banking." Section 24(Seventh) provides that national banks are authorized:

> To exercise . . . **all such incidental powers as shall be necessary to carry on the business of banking**; by discounting and negotiating promissory notes drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes [and provisions limiting securities and stock sales].

12 U.S.C. § 24(Seventh) (emphasis added).  The Supreme Court explicated this text definitively in *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995). OCC had interpreted the Section 24(Seventh) text to permit the Comptroller to authorize national banks to sell annuities to bank customers.  513 U.S. at 254.  That interpretation was challenged by an association of insurance agents that argued that the text should be read to limit the scope of

15

permissible banking powers under Section 24(Seventh) to activities connected with the five statutorily-enumerated powers: discounting, deposit-taking, trading in exchange and money, lending, and dealing in notes.  Under this theory, the general authorization to "exercise . . . all such incidental powers as shall be necessary to the business of banking" would be circumscribed by the succeeding text listing specific powers.  513 U.S. at 257-58.  The Supreme Court squarely rejected that argument.

First, the Court reviewed OCC's interpretation through the framework of *Chevron* deference.  513 U.S. at 256-57.  Applying this deferential  standard of review, the Court affirmed the OCC's construction of the Section 24(Seventh) phrase "incidental powers . . . necessary to carry on the business of banking" as an independent grant of authority, not limited by the specified enumerated grants of authority,  *id.* at 257, rejecting the argument by the insurance agents to the contrary:

> We expressly hold that the 'business of banking' is not limited to the enumerated powers in § 24 Seventh and that the Comptroller therefore has discretion to authorize activities beyond those specifically enumerated.  The exercise of the Comptroller's discretion, however, must be kept within reasonable bounds.  Ventures distant from dealing in financial investment instruments – for example, operating a travel agency – may exceed those bounds.

*Id.* at 258 n.2.  The Supreme Court's analysis resolved the question whether there is a distinction between "business of banking" and "all such incidental powers as shall be necessary to carry on the business of banking."  Before *NationsBank*, there were active questions whether a given power was "part of" the business of banking or "incidental to" the business of banking.  By equating the Section 24(Seventh) text with the "business of banking," *NationsBank* established that it is a unitary inquiry.

*NationsBank* marked a watershed in construing the term "business of banking," resolving an analytical dispute that had sharply divided courts of appeals for two decades.  On one side of the divide, the D.C. Circuit had prefigured *NationsBank* by rejecting a narrow interpretation of Section 24(Seventh), instead deferring to the "expert financial judgment" of the Comptroller. *Am. Ins. Ass'n v. Clarke*, 865 F.2d 278 (D.C. Cir. 1988) (municipal bond insurance part of the business of banking).  On the other side of the divide, two courts of appeals had adopted a more restrictive test limiting the scope of permissible powers to those related to the enumerated powers in Section 24(Seventh).  *See M&M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir. 1977) (power "must be 'convenient or useful' in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act") (equipment leasing); *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 431 (1st Cir. 1972) (test is whether the activities were "directly related to one or another of a national bank's express powers") (travel agency not authorized).  *NationsBank* rejected that test, implicitly superseding *Arnold Tours*, *M&M Leasing*, and other decisions that had relied upon them.[3]

### b.    The D.C. Circuit Has Confirmed OCC's Authority to Issue a Limited Purpose National Bank Charter

Just as, in *NationsBank*, the Supreme Court afforded OCC deference in interpreting the term "business of banking," OCC has received similar deference in interpreting that term to authorize a charter for an institution that would not exercise the full complement of banking powers.  *Indep. Cmty. Bankers Ass'n of South Dakota, Inc. v. Bd. of Governors of the Fed. Reserve*

---

[3]    While the *NationsBank* holding displaced the test applied by *M&M Leasing*, it nonetheless vindicated the broader policy observation articulated in *M&M Leasing* that "the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking."  *M&M Leasing*, 563 F.2d at 1382.

*Sys.*, 820 F.2d 428 (D.C. Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988).  In a chartering decision made long before the 2003 amendment of Section 5.20(e)(1), OCC issued a limited purpose national bank charter authorizing a national bank that would exercise only limited deposit taking powers so as to comply with state law.  These limitations allowed the bank to engage in interstate banking under the Bank Holding Company Act ("BHCA").[4]

The Independent Community Bankers Association of South Dakota ("ICBA") filed suit, challenging (1) the Federal Reserve Board's approval of the acquisition of a South Dakota-based national bank, newly created to carry out the credit card business of a Texas-based bank holding company; and (2) OCC's issuance of a charter to that credit card national bank with powers limited to conform to the South Dakota restrictions.[5]  Among the arguments made by the ICBA against the validity of the Federal Reserve's approval was that there is "no such institution as a 'special purpose' national bank," and that the limited bank charter granted by the Comptroller was otherwise inconsistent with federal law because the institution could not exercise the full panoply of bank powers under the National Bank Act.  820 F.2d at 438-40.  The D.C. Circuit rejected those arguments and held the authority to charter a limited purpose bank to be within the Comptroller's "particular expertise":

> We have no doubt but that the Comptroller's construction and application
> of the National Bank Act in this context is reasonable.  There is nothing in

---

[4]     At the time, the BHCA accorded states some control over the ability of bank holding companies to acquire a national bank in a state other than the institution's home state.  820 F. 2d at 430-31.  Then-applicable South Dakota law limited the operations of such national banks, in particular the deposit-taking function, in order to protect state-chartered institutions from competition.  *Id.* at 431.

[5]     The national bank charter application at issue in *ICBA v. FRB*, while proposing the primary activity of the new bank to be credit card services, also proposed to provide limited deposit-taking, lending, and checking services to the local community to the extent permitted under state law.  820 F.2d at 439.  There is nothing in the reasoning of the D.C. Circuit opinion that placed any weight on the existence of those nominal activities.

the language or legislative history of the National Bank Act that indicates congressional intent that the authorized activities for nationally chartered banks be mandatory.  Restriction of a national bank's activities to less than the full scope of statutory authority conflicts with the purposes of the Act only if it undermines the safety and soundness of the bank or interferes with the bank's ability to fulfill its statutory obligations. That judgment requires consideration of the particular legal and business circumstances of the individual banks—a judgment within the particular expertise of the Comptroller and reserved to his chartering authority.

820 F.2d at 440.  Accordingly, the D.C. Circuit's reasoning further supports OCC's authority to promulgate Section 5.20(e)(1) and issue charters pursuant to it.

> ### 2.   OCC Reasonably Interpreted the Statutory Term "Business of Banking" by Reference to Three Core Banking Activities Identified in the National Bank Act

OCC has reasonably interpreted the term "business of banking" to mean that the conduct of one of three statutorily identified "core activities" suffices to make an applicant eligible for a national bank charter.  In considering the 2003 amendment to Section 5.20(e)(1), OCC weighed the ways in which to give content to the statutory term "business of banking" to determine eligibility for a national bank charter.  Consistent with its interpretation, OCC's Final Rule provided: "A special purpose bank that conducts activities other than fiduciary activities must conduct at least one of the following three core banking functions: receiving deposits; paying checks; or lending money."  12 C.F.R. § 5.20(e)(1).

In the preamble to the Final Rule that promulgated amendments to Section 5.20(e)(1), OCC explained that it added the "core banking activities" requirement by reference to 12 U.S.C. § 36, which defines a national bank "branch" as a branch place of business "at which deposits are received, or checks paid, or money lent."  12 U.S.C. § 36(j).  While Section 36 does not include the term "business of banking," OCC looked for guidance to a Supreme Court decision that invoked the core activities of Section 36 to construe the statutory phrase the "general business of

each national banking association" in 12 U.S.C. § 81, a provision that restricts the locations where a bank can do business. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987).

In *Clarke*, OCC had approved a national bank's application to offer discount brokerage services at, among other places, non-branch locations both inside and outside the bank's home state, rejecting the argument that Section 81's phrase "general business of each national banking association" should be read more broadly, thereby limiting where such services could be conducted. 479 U.S. at 406. The Supreme Court affirmed OCC's interpretation. The Court noted that the phrase "the general business of each national banking association" is ambiguous, and held the Comptroller's interpretation entitled to deference. 479 U.S. at 403-04. The Court observed that national banks engage in many activities, and there was no evidence that Congress intended all of those activities to be subject to the geographical limitations of Sections 81 and 36. 479 U.S. at 406-09. Instead, the Court found reasonable OCC's conclusion that the general business of the bank under Section 81 included only "core banking functions," and not all incidental services that national banks are authorized to provide. 479 U.S. at 409. The Court also held that OCC reasonably equated "core banking functions" with the activities identified in Section 36, which defined "branch" as any place "at which deposits are received, or checks paid, or money lent." *Id.*

The Court's endorsement of OCC's analysis—that national banks engage in many activities, but that only these three activities represent "core banking functions" and so define the "general business" of the bank—provides support for treating any one of these same three activities as the required core activity for purposes of the chartering provisions. Just as the "general business" of each national bank is undefined in the location restriction of Section 81, the "business of banking" is undefined in the chartering provisions of Sections 21 and 27(a). The natural reading of the two phrases is similar in meaning, which supports the reasonableness of using the common

source of Section 36(j) for the interpretation of each.  Because the terms of Section 36 are linked by "or," performing only *one* of the activities is sufficient to meet the statutory definition and to cause the location restrictions to apply.  *See First Nat'l Bank in Plant City v. Dickinson*, 396 U.S. 122, 135 (1969).  This interpretation provides symmetry and consistency between the chartering and the location provisions of the National Bank Act and thereby reasonably interprets the ambiguous term "business of banking."

## C.     OCC Has Statutory and Constitutional Authority to Issue a 5.20(e)(1) Charter

Finally, OCC's authority to issue 5.20(e)(1) Charters is grounded in its statutory authority, and does not run afoul of the Constitution.

### 1.     The Limited Judicial Authority Cited by DFS Is Not Entitled to Weight

DFS cites two district court opinions for the proposition that a bank that does not receive deposits is not in the "business of banking," Compl. ¶ 7.  Each case quickly ceased to be viable law and has been superseded by legislation or subsequent Supreme Court authority.

In *Nat'l State Bank of Elizabeth, N.J. v. Smith*, 591 F.2d 223, 227 (3d Cir. 1979), OCC issued a charter to a national bank limited to trust-related activities and a district court concluded that the charter was contrary to law and invalid.  *Id.* at 227.  After the district court decision, and during the appeal, Congress amended 12 U.S.C. § 27(a) to recognize trust banks, both retroactively and going forward.  *Id.* at 231.  On appeal, the Third Circuit reversed the district court, applying the terms of the newly amended Section 27(a), declining to address the correctness of the district court decision when entered, and opining that the legislation had "validated the Comptroller's action."  591 F.2d at 231-32.

In *Independent Bankers Ass'n of America v. Conover*, 1985 U.S. Dist. Lexis 22529 (M.D. Fla. 1985) ("*Conover*"), a district court enjoined the OCC's from chartering "nonbank banks," banks limited so that they would either not accept demand deposits or make commercial loans, or both, so as to avoid the definition of "bank" in the BHCA and attendant restrictions on interstate operations. *Id.* at *2. But the analysis in *Conover* is in substantial conflict with the D.C. Circuit's later decision in *ICBA v. FRB*, which recognized OCC's authority to issue a limited purpose charter, and it is also in conflict with the expansive test for "business of banking" established in *NationsBank*. Accordingly, *Conover* provides no support for DFS's claim that OCC lacks the statutory authority to issue 5.20(e)(1) Charters.

### 2. The Historical Understanding of "Bank" Is Consistent with the OCC's Interpretation.

DFS also invokes historical practice in an attempt to establish that OCC is not authorized to charter a bank that does not take deposits, but that too misses the mark. The historical understanding of banking reflected in case law and legislation roughly contemporaneous with the National Bank Act does not support DFS's position. For example, Congress passed legislation in 1866 that, for the purpose of application of a tax on bank capital, denoted that "bank" would mean:

> Every incorporated or other bank, and every person, firm, or company having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid or remitted upon draft, check, or order, or where money is advanced or loaned on stocks, bonds, bullion, bills of exchange, or promissory notes, or where stocks, bonds, bullion, bills of exchange, or promissory notes are received for discount or for sale, shall be regarded as a bank or as a banker. . . .

Internal Revenue Act of 1866, ch. 184, 14 Stat. 98 (1866) at 115. Six years later, the Supreme Court considered the scope of a statutory exception to another tax provision applicable to banks contained in the Internal Revenue Act of 1866. *Oulton v. German Sav. & Loan Soc.*, 84 U.S. 109 (1872) (Clifford, J.). In support of its decision that a savings and loan was a "bank" within the

meaning of the statute, the Court stated that an institution is a bank "in the strictest commercial sense" if it engages in only *one* of the three functions of deposit taking, discounting, or circulation. *Id.* at 118-19. These expansive definitions recognizing various forms of non-deposit taking entities as a "bank" refute DFS's assertion that the Congress of the 1860s understood deposit-taking to be a necessary function of either a bank generally or of a national bank chartered pursuant to Section 27.

### 3.  Neither Section 5.20(e)(1) Nor Any Charter Issued Under Section 5.20(e)(1) in the Future Would Violate the Tenth Amendment

Finally, if OCC were ultimately to issue SPNB charters to fintechs pursuant to Section 5.20(e)(1), that decision would not run afoul of the Tenth Amendment.  It is well established that the Supremacy Clause operates in concert with the National Bank Act to displace state laws or state causes of action that conflict with federal law or that prevent or significantly interfere with national bank powers.  *See, e.g., Barnett Bank of Marion Co. v. Nelson,* 517 U.S. 25 (1996); *Franklin Nat'l Bank v. New York*, 347 U.S. 25 (1954).  As a federal regulation, Section 5.20(e)(1) preempts contrary state law.  *See, e.g., Smiley v. Citibank (South Dakota),* 517 U.S. 735 (1996); *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141 (1982).  A fintech chartered as a national bank under Section 5.20(e)(1) therefore would be entitled to the protections of the National Bank Act against state interference.  "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States."  *Watters v. Wachovia Bank, N.A*., 550 U.S. 1, 22 (2007).  "Regulation of national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses." *Id.* Accordingly, issuance of SPNB charters to fintechs under Section 5.20(e)(1) would not run afoul of the Tenth Amendment.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Date:   New York, New York
        August 18, 2017

                                Respectfully submitted,

                                JOON H. KIM
                                Acting United States Attorney for the
                                Southern District of New York
                                *Attorney for Defendants*

                        By:  /s/ Christopher Connolly
                                CHRISTOPHER CONNOLLY
                                Assistant United States Attorney
                                86 Chambers Street, 3rd Floor
                                New York, New York 10007
                                Tel.: (212) 637-2761
                                Fax: (212) 637-2786
                                christopher.connolly@usdoj.gov

AMY S. FRIEND
Senior Deputy Comptroller and Chief Counsel
CHARLES M. STEELE
Deputy Chief Counsel
KAREN SOLOMON
Deputy Chief Counsel
GREGORY F. TAYLOR
Assistant Director of Litigation
DOUGLAS B. JORDAN
PETER C. KOCH
ASHLEY W. WALKER
GABRIEL A. HINDIN
Office of the Comptroller of the
 Currency
400 7th Street S.W.
Washington, D.C. 20219