**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARIA T. VULLO, in her official capacity as
Superintendent of the New York State
Department of Financial Services,

                  Plaintiff,

            v.

                                                17 Civ. 3574 (NRB)

OFFICE OF THE COMPTROLLER OF THE
CURRENCY and KEITH A. NOREIKA, in his
Official capacity as Acting U.S. Comptroller of
the Currency,

                  Defendants.

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES
New York, N.Y. 10004
*Attorney for the Plaintiff*

Of Counsel:
Matthew L. Levine
Nathaniel J. Dorfman
James Caputo

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND...............................................................................3

ARGUMENT ......................................................................................................5

POINT I:    DFS HAS STANDING, AND THE FINTECH CHARTER DECISION
            IS BOTH FINAL AND RIPE FOR REVIEW .........................................5

    A.      DFS Has Standing to Challenge the Fintech Charter Decision ...............5

    B.      The Fintech Charter Decision is a "Final" Agency Action....................9

        1.  The Fintech Charter Decision Marks the Culmination of the
            OCC's Decision-Making Process .......................................9

        2.  The Fintech Charter Decision Has Legal Consequences ................12

    C.      The Fintech Charter Decision is Ripe for Judicial Review...................13

POINT II:   DFS's CHALLENGE TO THE FINTECH CHARTER DECISION
            STATES A CLAIM ...............................................................14

    A.      Congress Unambiguously Intended the "Business of Banking" to
            Include Deposit Taking...........................................................14

        1.  The NBA's Structure Demonstrates That Deposit Taking Is Central
            to the "Business of Banking".............................................16

        2.  The Fit of the NBA in the Overall Scheme of Federal Banking Law
            Demonstrates that the "Business of Banking" Must Include Deposit
            Taking. ..........................................................................17

            a. Pursuant to the NBA, FDIA, And FRA, to Be Lawfully
               Entitled to Commence the "Business Of Banking," a
               National Bank Must Be "Engaged in the Business of
               Receiving Deposits."...................................................19

            b. The "Business of Banking" Should Be Interpreted
               Consistently With the BHCA Definition of a "Bank,"
               Which Encompasses Only Deposit-Taking Institutions. .....................20

        3.  Common Sense Dictates that Deposit Taking Is Central to the
            "Business of Banking"........................................................22

i

B.    The OCC's Interpretation of the "Business of Banking" Is
      Unreasonable...........................................................................................23

      1.   Section 5.20(e)(1)'s Is Unreasonable Because It Fundamentally
           Changes the OCC's Regulatory Role ............................................23

      2.   The OCC's Rationale for Section 5.20(e)(1) is Unreasonable .......24

C.    Attempts by the OCC to Unlawfully Extend Its Authority and
      Charter Entities That Would Not Carry on the "Business of Banking"
      Have Routinely Been Struck Down by the Courts. ...............................26

POINT III:    DFS's FACIAL CHALLENGE TO SECTION 5.20(e)(1) IS TIMELY ...............28

POINT IV:    DFS HAS ALLEGED A VALID TENTH AMENDMENT CLAIM ..................29

CONCLUSION.......................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Heckler,*
    582 F. Supp. 1155, (S.D.N.Y. 1984)..................................................................6, 8

*Air Brake Systems, Inc. v. Mineta,*
    357 F.3d 632 (6th Cir. 2004) .............................................................................12

*Alaska v. U.S. Dep't of Transp.,*
    868 F.2d 441 (D.C. 1989) ....................................................................................6

*Alfred l. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982)..............................................................................................5

*American Land Title Ass'n v. Clarke,*
    968 F.2d 150 (2d Cir. 1992)...............................................................................17

*Benckiser, Inc. v. EPA,*
    613 F.3d 1131 (D.C. Cir. 2010) .........................................................................10

*Bowen v. Public Agencies Opposed to Social Security Entrapment,*
    477 U.S. 41 (1986)................................................................................................5

*CBF Industria de Gusa v. AMCI Holdings, Inc.,*
    850 F.3d 58 (2d Cir. 2017)...................................................................................9

*Chevron v. NRDC, Inc.,*
    467 U.S. 837 (1984)..............................................................................................2

*Ciba-Geigy Corp. v. EPA,*
    801 F.2d 430 (D.C. Cir. 1986)...................................................................9, 10, 12

*Citizens Against Casino Gambling in Erie County v. Chaudhuri,*
    802 F.3d 267 (2d Cir. 2015) ..............................................................................29

*City of Yonkers v. Downey,*
    309 U.S. 590 (1940) ...........................................................................................22

*Colo. Nat'l Bank v. Bedford,*
    310 U.S. 41 (1940) ........................................................................................18, 22

*Cuomo v. Clearing House Ass'n, LLC,*
    557 U.S. 519 (2009).............................................................................................15

*ETSI Pipeline Project v. Missouri,*
　　484 U.S. 495 (1988)........................................................................18

*FDA v. Brown & Williamson Tobacco Corp.,*
　　529 U.S. 120 (2000)..........................................................16, 18, 22

*Federal/Postal/Retiree Coalition v. Devine,*
　　751 F.2d 1424 (D.C. Cir. 1985) ..................................................... 13

*First Nat'l Bank in Plant City v. Dickinson,*
　　396 U.S. 122 (1969).......................................................................25

*First Nat'l Bank of Logan v. Walker Bank & Trust Co.,*
　　385 U.S. 252 (1966).......................................................................25

*Franklin Fed. Sav. Bank v. Office of Thrift Supervision,*
　　927 F.2d 1332 (6th Cir. 1992) .......................................................12

*Franklin Nat. Bank of Franklin Square v. New York,*
　　347 U.S. 373 (1954).......................................................................12

*Gen. Dynamic Land Sys., Inc. v. Cline,*
　　540 U.S. 581 (2004).......................................................................23

*Indep. Bankers Ass'n of Am. v. Conover,*
　　1985 U.S. Dist. Lexis 22529 (M.D. Fla. 1985)..............................21, 26, 27, 28

*Indep. Bankers Ass'n of Am. v. Heimann,*
　　613 F.2d 1164 (D.C. Cir. 1979) .................................................10, 13

*Indep. Bankers Ass'n of Am. v. Smith,*
　　534 F.2d 921 (D.C. Cir. 1976) .......................................................13

*Indep. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.,*
　　195 F.3d 28 (D.C. Cir. 1999) .........................................................29

*Indep. Cmty. Bankers Assoc. v. Bd. of Governors of the Fed. Reserve Sys.,*
　　820 F.2d 428 (D.C. Cir. 1987) .......................................................28

*Indep. Ins. Agents of Am., Inc. v. Hawke,*
　　211 F.3d 638 (D.C. Cir. 2000) ...................................................17, 18

*Jindal v. United States Dep't of Educ.,*
　　2015 U.S. Dist. LEXIS 23356 (M.D. La. Feb. 26, 2015) .................9

*LaFleur v. Whitman,*
　　300 F.3d 256 (2d Cir. 2002)............................................................6

iv

*Lewis v. Grinker*,
    965 F.2d 1206 (2d Cir. 1992).............................................................................11

*Li v. Renaud*,
    654 F.3d 376 (2d Cir. 2011)...............................................................................16

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)...............................................................................................6

*MCI Telecomm. Corp. v. AT&T*,
    512 U.S. 218 (1994)..............................................................................23, 24, 26

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)............................................................................................30

*National Bank of Elizabeth, N.J. v. Smith*,
    591 F.2d 223 (3d Cir. 1979)..........................................................................16, 26

*National State Bank v. Smith*,
    1977 U.S. Dist. LEXIS 18184 (D.N.J. Sept. 16, 1977) ...................................26

*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*,
    513 U.S. 251 (1995)........................................................................14, 15, 18, 22

*New York v. EPA*,
    350 F. Supp.2d 429 (S.D.N.Y. 2004)..........................................................11, 12

*New York v. FERC*,
    535 U.S. 1 (2002)...............................................................................................30

*New York v. Shore Realty Corp.*,
    759 F.2d 1032 (2d Cir. 1985).............................................................................17

*Nutritional Health Alliance v. Shalala*,
    144 F.3d 220 (2d Cir.)........................................................................................13

*Presley v. Etowah County Commission*,
    502 U.S. 491 (1992)...........................................................................................23

*Republic of Iraq v. ABB AG*,
    920 F. Supp.2d 517 (S.D.N.Y. 2013)..................................................................5

*Robin. v. Shell Oil Co.*,
    519 U.S. 337 (1997)...........................................................................................15

*Salazar v. King,*
    822 F.3d 61 (2d Cir. 2016)..............................................................................9

*Sharkey v. Quarantillo,*
    541 F.3d 75 (2d Cir. 2008)...............................................................9, 10, 13

*Sullivan v. Stroop,*
    496 U.S. 478 (1990)......................................................................................18

*Texas v. U.S.,*
    809 F.3d 134 (5th Cir. 2015) ........................................................................6

*Texas & Pacific Ry. Co. v. Pottorf,*
    291 U.S. 245 (1934).....................................................................................22

*Texas Office of Pub. Utility Counsel v. FCC,*
    183 F.3d 393 (5th Cir. 1999) ........................................................................5

*U.S. v. Philadelphia National Bank,*
    374 U.S. 321 (1963).....................................................................................22

*U.S. v. Quinones,*
    313 F.3d 49 (2d Cir. 2002)...........................................................................13

*Utility Air Regulatory Group v. EPA,*
    134 S. Ct. 2427 (2014)...........................................................................23, 24

*Whitman v. Am. Trucking Ass'n, Inc.,*
    531 U.S. 457 (2001).......................................................................................9

*Whitney National Bank v. Bank of New Orleans & Trust Co.,*
    379 U.S. 411 (1965).....................................................................................20

*Williams v. Taylor,*
    529 U.S. 420 (2000).........................................................................16, 18, 22

*Wyoming v. U.S.,*
    539 F.3d 1236 (10th Cir. 2008) ..............................................................6, 8

## STATUTES

12 U.S.C. § 21................................................................................................19

12 U.S.C. § 24...........................................................................................1, 14

12 U.S.C. § 26................................................................................................19

12 U.S.C. § 27 ...........................................................................................................16, 17, 19, 26

12 U.S.C. § 36 ...........................................................................................................24

12 U.S.C. § 81 ...........................................................................................................24

12 U.S.C. § 222 ........................................................................................................19, 21

12 U.S.C. § 501a .......................................................................................................19

12 U.S.C. § 1813 .......................................................................................................21

12 U.S.C. § 1815 .......................................................................................................19

12 U.S.C. § 1841 .......................................................................................................20

**REGULATIONS**

12 C.F.R. § 5.20 ........................................................................................................4

**SECONDARY SOURCES**

Symons, Edward L. Jr., *The "Business of Banking" in Hist. Perspective*,
    51 Geo. Wash. L. Rev. 676, 718 (1983) ................................................................ 21

## PRELIMINARY STATEMENT

Prior to issuing the Fintech Charter Decision at issue in this case, the Office of the Comptroller of the Currency has never before issued a charter to a nondepository institution without explicit statutory authorization.   Since the founding of the Republic, the regulation of non-depository institutions has been the province of the States.  Absent a clear and unequivocal delegation of authority to charter non-depository institutions – which would upend decades if not a hundred years of State laws – the right to charter nondepository institutions remains with the States.  The Fintech Charter Decision is an unlawful assertion of power that usurps New York consumer protection laws and would preempt Plaintiff's ability to regulate any number of the over 600 nondepository institutions she currently regulates.

Plaintiff Maria Vullo, Superintendent of the New York State Department of Financial Services ("DFS"), respectfully submits this memorandum of law in opposition to the motion to dismiss the complaint filed by Defendants Office of the Comptroller of the Currency and Acting Comptroller Keith A. Noreika (collectively, "OCC").  The OCC's present motion to dismiss the complaint is entirely without merit.  DFS's complaint more than adequately alleges that the OCC's unlawful final administrative determination (the "Fintech Charter Decision") that it has the authority to grant national bank charters to non-depository financial technology ("fintech") companies and thus the right to preempt state laws and regulatory authority over these entities, exceeds the OCC's authority under the National Bank Act ("NBA") and violates the Tenth Amendment. As used in the NBA, the term "business of banking" in 12 U.S.C. § 24 (Seventh) ("Section 24 (Seventh)") unambiguously requires deposit taking, and thus OCC's contrary interpretation should be given no weight.

Unlike the OCC, DFS has chartered nondepository institutions under state banking law for decades.  DFS is tasked by New York law with the protection of consumers of financial

services in the state.  The Fintech Charter Decision preempts New York law.  As the state agency responsible for enforcing the New York banking law and financial services law, see N.Y. Fin. Servs. Law § 102, DFS is uniquely entitled to contest the OCC's *ultra vires* intrusion upon New York's regulatory authority.  Further, OCC's decision exposes the citizens of New York to predatory lending practices and consumer-abusive business models, by preempting New York laws which have long prohibited them.

The OCC maintains that this Court lacks subject-matter jurisdiction over the complaint, and that, in any event, DFS fails to state a claim for relief.  The OCC is wrong on all counts. Running through its checklist of jurisdictional defenses, the OCC first argues that DFS lacks standing to challenge the Fintech Charter Decision, and that the Fintech Charter Decision is neither final agency action nor ripe for review.  None of these arguments is persuasive.   The Fintech Charter Decision is the culmination of an extended administrative decision-making process, from which – according to the OCC – very significant legal consequences flow.  And the issues raised by DFS's challenge are purely legal, which, if left unresolved now, will result in substantial hardship.  There are no jurisdictional bars to this case.

On the merits, the OCC insists that Section 24 (Seventh)'s reference to the "business of banking" is ambiguous and that, according to *Chevron v. NRDC, Inc.*, 467 U.S. 837 (1984) ("*Chevron*"), the agency's interpretation of that phrase is entitled to controlling deference.   But the most basic tools of statutory construction leave no doubt that Congress intended the "business of banking" to include deposit taking.  Given the clarity of contrary congressional intent, the OCC's misguided definition cannot stand.

In any event, even if the statutory language were unclear, the OCC's interpretation is unreasonable and therefore invalid under *Chevron*.  Section 5.20(e)(1) supplants a regulatory

regime that has existed for almost 150 years and would fundamentally change the OCC's heretofore non-existent role in regulating non-depository financial institutions.   That sort of radical restructuring of banking policy cannot succeed under the guise of statutory "interpretation."  Indeed, in the past where OCC has attempted to unlawfully extend its chartering authority to non-depository institutions, courts have consistently struck down OCC interpretations.  Where Congress intends to allow an agency to preempt state law by regulation it does so expressly.  No such Congressional authorization exists here.

## FACTUAL BACKGROUND

DFS is responsible for the regulation of all banking, insurance, and financial services products sold, and institutions doing business, in the state.  DFS was formed in 2011 by combining the New York Insurance and Banking Departments.  DFS, as the successor to the New York Banking Department, has been responsible for the regulation of all entities chartered or licensed under the New York banking law since 1851.  This authority extends to both depository and over 600 nondepository entities including licensed lenders, money transmitters, check cashers, sales finance companies, and mortgage loan originators.

In relevant part, Chapter 12, section 24 of the United States Code enables the OCC to charter national banking associations by granting them "all such incidental powers as shall be necessary to carry on the *business of banking*; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes . . . ."  Cmplt. ¶ 21 (citing Section 24 (Seventh) (emphasis added)).  This section has been an anchor provision of the National Bank Act since 1863.   It is long-settled that the historical phrase "business of banking" defines the scope of financial activities in which a national bank chartered by the OCC may or must engage.  *Id.* at ¶ 22.

Pursuant to this authority, the OCC has promulgated regulations for the organization of national banks.  Cmplt. at ¶ 24 (citing 12 C.F.R. § 5.20).  In 2003, the OCC amended its regulations to create, *for the first time in nearly 140 years*, a new category of nationally chartered institutions described as "special purpose" banks.  *Id.* (citing 68 FR 70122-01 (Dec. 17, 2003)).  According to the amended rule, an OCC-chartered firm could "be a special purpose bank that limits its activities to fiduciary activities *or to any other activities within the business of banking*."  *Id.* (citing § 5.20(e)(1)(i) (emphasis added)).  The amended regulation further provides that a "special purpose bank that conducts activities other than fiduciary activities must conduct *at least one* of the following core banking functions:  Receiving deposits, paying checks, *or* lending money."  *Id.* (emphasis added).

In March 2017, after a year of agency proceedings—including multiple rounds of public notice and comment—Cmplt. ¶¶ 28-33, the OCC announced the Fintech Charter Decision, *id.* at ¶ 34.  That decision was iterated in two documents:  an *OCC Summary of Comments and Explanatory Statement:  Special Purpose National Bank Charters for Fintech Companies* ("Summary of Comments") and a draft supplement to the Comptroller's Licensing Manual, entitled *Evaluating Charter Applications from Financial Technology Companies* ("Manual Supplement").  *Id.* at ¶¶ 34-38.  Both documents stated the OCC's definitive conclusions, *i.e.,* (a) it is in the public interest to grant fintech charters; (b) fintech-chartered national banks would *not* accept deposits; and (c) the agency had authority to grant such charters pursuant to Section 5.20(e)(1).  *Id.* at ¶¶ 35-38.  And just before OCC published the Summary of Comments and Draft Manual Supplement, then-Comptroller Thomas J. Curry assured the public that the OCC "will be issuing charters to fintech companies."  *Id.* at ¶ 37.

On May 15, 2017, DFS filed this action challenging the Fintech Charter Decision.  The

Complaint alleges that OCC's actions sought improperly to preempt New York banking law, and

that it will have "unavoidable and drastic consequences . . . for New York State, its residents, and

its businesses," Cmplt.  ¶¶ 3, 5, 8, 11, 40, 61.  The Complaint challenges the Fintech Charter

Decision and Section 5.20(e)(1) for exceeding OCC's statutory authority, and relatedly maintains

that the Fintech Charter Decision violates the Tenth Amendment to the U.S. Constitution, Cmplt.

¶¶ 49-62.  Accordingly, DFS seeks declaratory and injunctive relief.  *Id.* at ¶¶ 63-66.

## ARGUMENT
**POINT I:     DFS HAS STANDING, AND THE FINTECH CHARTER DECISION
IS BOTH FINAL AND RIPE FOR REVIEW**

**A.     DFS Has Standing to Challenge the Fintech Charter Decision**

The standing possessed by DFS to bring this case is pellucid.  DFS is responsible for

enforcing New York's banking, insurance, and financial services laws, and for supervising all

entities subject to those laws.  Cmplt. ¶¶ 16-18.  Because the OCC has declared that fintech

charters preempt New York banking, financial service, and consumer protection laws, *see* Cmplt.

¶ 30 & Ex. B at 5*,* the Fintech Charter Decision undermines DFS's regulatory authority over the

financial services industry within its borders.

"[T]here is no question concerning [a] State's standing to bring [an] action" where it

alleges an "interest in the preservation of its own sovereignty, and a diminishment of that

sovereignty."  *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41,

50 n.17 (1986).  Thus, a state may acquire standing by "seek[ing] to invoke 'the power to create

and enforce a legal code.'"  *Republic of Iraq v. ABB AG*, 920 F. Supp.2d 517, 531 (S.D.N.Y.

2013) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601

(1982)); *see also Texas Office of Pub. Utility Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999).

It follows that "[f]ederal regulatory action that preempts state law" sufficiently encroaches upon

state sovereignty to afford standing.  *Wyoming v. U.S.*, 539 F.3d 1236, 1242 (10th Cir. 2008); *see also Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443-44 (D.C. 1989) (same); *accord Abrams v. Heckler*, 582 F. Supp. 1155, 1161-62 (S.D.N.Y. 1984) (NYS Superintendent of Insurance held to have standing to challenge Medicare regulation that negated state insurance law).

The OCC attempts to evade this principle by claiming that *nothing* about the Fintech Charter Decision "has resulted in any cognizable harm to DFS."  OCC Br. at 6.  Quickly falling back, the OCC ultimately settles on a different argument – that DFS lacks standing because the OCC has not yet issued a Fintech Charter.  *See id.* at 8.   According to the OCC, the alleged harms to New York State and its residents resulting from federal preemption is "speculative and therefore insufficient to confer standing."  *Id.* at 7.

That argument should be rejected because the law governing standing is generous.  The Second Circuit has explained that the "injury in fact necessary for standing need not be large, an identifiable trifle will suffice."  *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (internal quotation marks omitted).

This broad standard for cognizable injury is further informed by the nature of the injury alleged here, that to a state agency empowered to protect its residents' interests.    "States are not normal litigants for the purposes of invoking federal jurisdiction," and New York's "stake in protecting" its sovereign interests "is entitled to special solicitude in [the Court's] standing analysis."  *Massachusetts v. EPA*, 549 U.S. 497, 518-20 (2007); *see also Texas v. U.S.,* 809 F.3d 134, 151 (5th Cir. 2015) (affording "special solicitude" to state's standing to challenge federal immigration policy), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016); *Wyoming*, 539 F.3d at 1241 (in state challenge to federal preemption courts "must also keep in mind the Supreme

Court's recent guidance that States constitute a special class of plaintiffs for federal jurisdiction purposes"). These principles leave no question as to DFS's standing here.

To start, in March 2017, after more than a year of regulatory proceedings, the OCC conclusively determined that "making SPNB charters available to qualified fintech companies would be in the public interest." Summary of Comments, Cmplt. Ex. H at 3; see also Draft Manual Supplement, Cmplt. Ex. I at 1 (OCC "has determined that it is in the public interest to consider applications for a special purpose national bank (SPNB) charter from financial technology (fintech) companies"). Thomas J. Curry, then U.S. Comptroller of the Currency, unequivocally assured the public that the OCC "*will be* issuing charters to fintech companies engaged in the business of banking." *Remarks by Thomas J. Curry, Comptroller of the Currency at LendIt USA*, March 6, 2017 ("Curry Speech"), Cmplt. Ex. J at 5 (emphasis added).

As alleged in the complaint, the federal preemption that strikes at New York's sovereignty "*will surely*" come with those forthcoming fintech charters. *See* Cmplt. ¶ 40. That harm constitutes injury-in-fact. The granting of fintech charters by the OCC will mean that New York will no longer be able to enforce its laws, such as those which protect consumers from usurious rates, money laundering, and other criminal and consumer abusive practices. New York law and supervision are entirely supplanted by the Fintech Charter Decision and the protection of New Yorkers is relegated to Washington. After an OCC fintech charter is issued to a specific entity, DFS will lose the right to supervise that entity and protect New Yorkers from predatory lending, illegal debt collection activities, and other conduct that violates New York law.

While New York's sovereign interest in guarding against the preemptive effect of the Fintech Charter Decision is more than sufficient to confer standing here, DFS alleges additional, concrete harms that flow from the Fintech Charter Decision, both to the New York citizens DFS

seeks to protect and to DFS itself.  *See* Cmplt. ¶¶ 10-11, 40-48.  First, DFS alleges concrete

harms to consumers of financial services in this state.  *See id.* at ¶ 41-45.  The Fintech Charter

Decision robs New York consumers of the protections afforded them under New York law.  For

example, the Fintech Charter Decision exposes consumers to payday, and other high-interest,

small dollar lending, which "charge exorbitant interest rates that trap consumers in a cycle of

high-interest borrowing that they can never repay, leading to the sort of economic and social

devastation like that seen in the recent foreclosure crisis."  *Id.* at ¶ 44.  As these types of lending

are illegal under New York law, consumers would not be exposed to these exploitative

practices—*but for the Fintech Charter Decision*.[1]

Further, as DFS is funded by assessments on entities under its authority, "[e]very non-

depository financial firm that receives an OCC special purpose charter in place of a New York

license . . . deprives DFS of crucial resources that are necessary to fund the agency's regulatory

function." *Id.* at ¶ 48.  The Fintech Charter Decision directly threatens the operations of DFS in a

quantifiable amount.  The annual assessment for 2016-17 from licensed financial services firms,

including money transmitters and check cashers, totaled $13.5 million.  *Id.* at ¶ 47.  The Fintech

Charter Decision concretely threatens collection of necessary assessments going forward.

Notably, DFS need not *prove* either the preemptive effect or the concrete harms alleged

at this stage, as the Court must "accept as true all material allegations in the complaint and

construe the complaint in favor of" DFS including the facts establishing standing.  *CBF Industria*

---

[1]    Based upon its claim that DFS cannot establish an injury-in-fact, the OCC summarily concludes that DFS likewise "cannot show causation or redressability" – the other two requirements for standing.  OCC Br. at 8.  That argument is also without merit.  DFS's alleged injury "fulfills both requirements because the [agency's action] directly caused the injury and the requested injunctive and declaratory relief would bar the effect" of that action. *Wyoming*, 539 F.3d at 1242; *see also Abrams*, 582 F. Supp. at 1162 (alleged displacement of state insurance law "can fairly be traced to the Secretary's regulation and that the requested injunction prohibiting enforcement of the regulation would redress the injury").

*de Gusa v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017); *see also Jindal v. United States Dep't of Educ.,* 2015 U.S. Dist. LEXIS 23356 at *20 (M.D. La. Feb. 26, 2015).

**B.      The Fintech Charter Decision is a "Final" Agency Action**

   The OCC also insists that the complaint should also be dismissed because the Fintech Charter Decision is not a final agency action and therefore may not be challenged under the Administrative Procedures Act ("APA").  *See* OCC Br. at 10.  Now, under attack, the OCC seeks to characterize the Fintech Charter Decision as merely "a collection of non-final policy statements and solicitations for input from the public."  *Id.*  Obfuscation aside, the final agency action here is clear: ***the OCC has conclusively determined that Section 5.20(e)(1) provides the agency valid regulatory authority to grant Fintech Charters and that it is in the public interest to do so***.

   For an agency action to be final, it must satisfy two conditions: (1) the action must mark the consummation of the agency's decision-making process; and (2) the action must be one by which rights or obligations have been determined or from which legal consequences will flow.  *See Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008).  Courts apply this test in "a pragmatic way," *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (internal quotation marks omitted) and thus an agency need not "dress[] its decision with the conventional procedural accoutrements of finality" for it to be final nonetheless, *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 479 (2001).  Stated otherwise, the finality requirement is *not* to be applied in a "hypertechnical fashion."  *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 n.7 (D.C. Cir. 1986).

   1. The Fintech Charter Decision Marks the Culmination
     of the OCC's  Decision-Making Process

   When the OCC announced the Fintech Charter Decision in March 2017, the agency explained that it had "*reached this decision* for a number of reasons."  Draft Manual Supplement, Cmplt. Ex. I at 1 (emphasis added and footnote omitted).  These reasons were conclusive and not

at all tentative.  The OCC "*reached this decision*" after publishing a detailed white paper

proposing Fintech Charters, and then receiving, reviewing, and responding to over 100 public

comments on the proposal.  *See* Summary of Comments, Cmplt. Ex. H at 2; *see also* Cmplt. ¶¶

28-38.  The OCC's "interpretation of its authority here is definitive" and therefore final.  *Reckitt*

*Benckiser, Inc. v. EPA*, 613 F.3d 1131, 1138 (D.C. Cir. 2010) (agency notification letter held

final agency action where it embodied definitive statutory interpretation); *see also Ciba-Geigy*,

801 F.2d at 438 n.9 ("It is settled . . . that an agency may not avoid judicial review merely by

choosing the form of a letter to express its definitive position on a general question . . . .").

     The OCC nonetheless denies that the Fintech Charter Decision is final.  First, the agency

half-heartedly claims that the Fintech Charter Decision is not final because the agency

anticipated further "public comment on an envisioned *application process* for fintech

companies."  OCC Br. at 11 (emphasis added and internal quotation marks omitted).  The

argument is fruitless.   The Draft Manual Supplement, to which the OCC refers, simply "explains

how the OCC *will* apply the licensing standards and requirements in its existing regulations and

policies to fintech companies applying for a . . . charter," and seeks public comment on those

issues.  Draft Manual Supplement, Cmplt. Ex. I at 2 (emphasis added).  By planning further steps

to implement the Fintech Charter Decision, the OCC underscores its conviction to grant such

charters.  The act of preparing application procedures would be pointless otherwise.

     Those collateral proceedings do not affect the finality of the Fintech Charter Decision.

The law is clear that an "agency's action is final notwithstanding the possibility of further

proceedings . . . on related issues, so long as judicial review at the time would not disrupt the

administrative process."  *Sharkey*, 541 F.3d at 89 (internal quotation marks and brackets

omitted).  OCC's consideration of the Draft Manual Supplement are "further proceedings" on an

issue "related" to the Fintech Charter Decision, and DFS's challenge to the latter has no effect whatsoever on the former.

Second, the OCC disputes the finality of the Fintech Charter Decision based upon a self-serving speech that the Acting Comptroller gave in July 2017 – two months *after* DFS challenged the Fintech Charter Decision in this Court.  *See* OCC Br. at 12.[2]  But even in that speech, the Acting Comptroller reaffirmed the OCC's determination that it possessed authority "to grant national bank charters to fintech technology companies that don't take deposits."  He opportunely stated (no doubt for this record) that "the OCC has not determined whether it will actually accept or act upon applications from nondepository fintech companies for special purpose nation bank charters that rely on *this* regulation."  Exchequer Club Remarks at 9.

The OCC insists that the Acting Comptroller's words magically "confirmed the indeterminate status" of the Fintech Charter Decision.  OCC Br. at 12.  Nonsense.  This "attempt, in the face of litigation, to depict [the agency's decision] as 'non-actions' is . . . as disingenuous as it is inaccurate."  *New York v. EPA*, 350 F. Supp.2d 429, 436 (S.D.N.Y. 2004).  The Acting Comptroller's statement is precisely "the sort of *post hoc* litigation posture that is entitled to no deference."  *Lewis v. Grinker*, 965 F.2d 1206, 1220 (2d Cir. 1992).  Tellingly, the OCC does not say that it will not and cannot charter nondepository institutions, further indicating that its decision in this regard is final.  Indeed, the previous Comptroller's definitive *pre-litigation* pledge that the OCC "will be issuing charters to fintech companies," Curry Speech, Cmplt. Ex. J at 5, is far more indicative of the Fintech Charter Decision's final status than the Acting

---

[2] In his speech the Acting Comptroller candidly admitted that he had "to be careful about" his statements regarding the Fintech Charter Decision because DFS had just named him "as a defendant in its lawsuit challenging the OCC's authority to grant special purpose national bank charters to fintech companies."  Keith A. Noreika, Acting Comptroller, the Office of the Comptroller of the Currency, Exchequer Club Remarks (July 19, 2017) at 4, available at https://occ.treas.gov/news-issuances/speeches/2017/pub-speech-2017-82.pdf.

Comptroller's *post-litigation* hedge, *cf. New York*, 350 F. Supp.2d at 436 ("Defendant's assertion … belied by the EPA's own earlier description of the actions.").

    2.    <u>The Fintech Charter Decision Has Legal Consequences</u>

Next, the OCC contends that the Fintech Charter Decision is not final because "no legal consequences have flowed from [the agency's] actions to date." OCC Br. at 12. That claim is demonstrably false because the OCC has expressly invoked *Chevron* deference in defending the merits of its directive. "When an agency has acted so definitively that its actions are defended based on *Chevron*, . . . its action should be treated as final." *Franklin Fed. Sav. Bank v. Office of Thrift Supervision*, 927 F.2d 1332, 1337 (6th Cir. 1992). It "is the binding effect of agency interpretations eligible for *Chevron* deference that establishes legal consequences will flow from them." *Air Brake. v. Mineta*, 357 F.3d 632, 642 (6th Cir. 2004) (internal quotation omitted).[3]

Here, the OCC expressly invokes *Chevron* deference to defend against the complaint's attack on OCC's overbroad exercise of authority. *See* OCC Br. at 14. OCC's argument is a "reliable indicator that [the OCC's] interpretation . . . has the requisite legal consequences" to be reviewable. *Air Brake Systems, Inc.*, 357 F.3d at 641. The OCC cannot have it both ways—it cannot claim that the Fintech Charter Decision lacks any legal consequence while at the same time demanding *Chevron* deference. *See, e.g., Franklin Fed. Sav. Bank*, 927 F.2d at 1337 (rejecting agency's claim that action was non-final because agency "demand[ed], on the merits, the deference due it under *Chevron*"). The Fintech Charter Decision is a final agency action ready for judicial review.

---

[3] *See also Ciba-Geigy*, 801 F.2d at 437 (letter from EPA official held final agency action because it "would be entitled to deference from the least dangerous branch" thereby having a "significant legal effect" (internal quotation marks omitted)); accord *Hall v. Sebelius*, 689 F. Supp.2d 10, 21 (D.D.C. 2009) (agency manual held to have legal consequences, and therefore considered final agency action, because it was afforded Skidmore deference).

**C.      The Fintech Charter Decision is Ripe for Judicial Review**

For its last jurisdictional defense, the OCC argues that the Fintech Charter Decision is not ripe for judicial review.  *See* OCC Br. at 8-9.  That position fails, too.  The ripeness inquiry examines the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.  *See Sharkey*, 541 F.3d at 89. The Superintendent's challenge satisfies both prongs.

To start, as alleged in the complaint, *see* Cmplt. ¶¶ 24-25, the Fintech Charter Decision's fatal flaw turns on a pure question of law, *i.e.,* does the OCC lack the statutory authority under the NBA to charter non-depository institutions?[4]  This issue is "clearly ripe" for review because it "involves a purely legal question that is eminently fit for judicial review."  *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 227 (2d Cir.), *cert. denied*, 525 U.S. 1040 (1998); *see also U.S. v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002) (same), *cert. denied*, 540 U.S. 1051 (2003).[5] Indeed, courts have repeatedly held that challenges to the Comptroller's statutory authority to promulgate regulations and interpretive rulings under the NBA are purely legal in nature and therefore fit for review.  *See, e.g., Indep. Bankers Ass'n of Am. v. Heimann*, 613 F.2d 1164, 1167 (D.C. Cir.) (rejecting ripeness challenge to OCC regulation because claim raised purely legal issues fit for review); *Indep. Bankers Ass'n of Am. v. Smith*, 534 F.2d 921, 927-98 (D.C. Cir. 1976).  Moreover, the hardships to the Superintendent and New Yorkers from the Fintech Charter Decision discussed above are unnecessary and would follow from a decision by the Court rejecting its jurisdiction for the claims asserted in the complaint.

---

[4]      The OCC seeks to mischaracterize the relevant question by framing it as whether the agency will offer or accept applications for fintech charters.  *See* OCC Br. at 9.  For ripeness purposes, however, the relevant question is whether the OCC has *the legal authority* to offer or accept applications for fintech charters.  The OCC has repeatedly and forcefully answered that question in the affirmative.

[5]      As a general matter, even an agency's stated "intention" to act can "squarely present[] for resolution the legal issue whether [the agency] has authority" to act, creating a "pivotal legal issue . . . ripe for review."  *Federal/Postal/Retiree Coalition v. Devine*, 751 F.2d 1424, 1426 (D.C. Cir. 1985).

**POINT II:    DFS's CHALLENGE TO THE FINTECH CHARTER
                DECISION STATES A CLAIM**

The OCC also seeks dismissal of the complaint on its merits, arguing that "under the framework articulated in [*Chevron*], Section 5.20(e)(1) represents a reasonable OCC interpretation of the undefined and ambiguous statutory term 'business of banking.'"  OCC Br. at 13.  The agency is wrong on both counts.  Insofar as identifying essential banking functions under Section 24 (Seventh) for *chartering purposes*, Congress unquestionably intended the phrase "business of banking" to include deposit taking.  *Chevron* deference has no place here.

But even if Congress left a gap for the OCC to fill, Section 5.20(e)(1) constitutes a manifestly unreasonable interpretation of the statute.  The OCC's conclusion that Section 24 (Seventh) generally empowers the agency to grant national bank charters to non-depository institutions warrants no deference, as it rests upon an obvious distortion of Supreme Court precedent and will trigger a seismic restructuring of financial-services regulation nationwide.

**A.     Congress Unambiguously Intended the "Business of Banking" to Include
          Deposit Taking**

Relying on *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995), the OCC argues the phrase "business of banking" is ambiguous, and therefore the agency's interpretation demands *Chevron* deference.  *See* OCC Br. at 15-16.  But this case does not aid the OCC's position.  In *NationsBank*, the Court merely held "that the 'business of banking' is not limited to the enumerated powers in § 24 Seventh and that the Comptroller therefore has the discretion to authorize activities *beyond those specifically enumerated*."  513 U.S. at 258 n.2 (emphasis added).  The Supreme Court did *not* hold that the phrase "business of

banking" was ambiguous for all purposes; nor did the Court address whether any banking function was an essential function for *chartering* purposes.[6]

In statutory construction, context matters.  *See Robin. v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").  The Fintech Charter Decision involves a class of nondepository institutions that the OCC has never before chartered.  After not chartering this class of institutions for 150 years, the OCC cannot credibly claim that *NationsBank* supports their new position and that they now have the statutory right to preempt state laws that have been on the books for generations.

Fourteen years after *NationsBank* was decided, the Supreme Court made this point crystal clear, and specifically with regard to the OCC's power to interpret the NBA.  In *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519 (2009), the Court invalidated an OCC regulation prohibiting states from "prosecuting enforcement actions" against national banks.  The OCC had claimed that the NBA's prohibition against states exercising "visitorial powers" over national banks was ambiguous, and therefore its regulation was valid under *Chevron*.  *See id.* at 524-25.

The Court rejected the OCC's position.  Although the Supreme Court acknowledged that there is "necessarily some ambiguity as to the meaning of the statutory term "visitorial powers," the Court emphasized that "the presence of some uncertainty does not expand *Chevron* deference to cover virtually any interpretation of the [NBA]."  *Cuomo*, 557 U.S. at 525.  Rather, the Supreme Court explained that it could "discern the outer limits" by examining "[e]vidence from the statutes enactment, a long line of . . . cases, and application of normal principles of

---

[6] In *NationsBank*, the OCC determined that, among other services, the "business of banking" included the sale of annuities.  *See* 513 U.S. at 254.  The Supreme Court did not hold that the OCC could charter a bank that would only sell annuities.

construction to the National Bank Act."  *Id.*  Using these same methods, it becomes eminently

clear that the "business of banking" must include deposit taking.

In order to determine congressional intent, "a reviewing court must first exhaust the

traditional tools of statutory construction," and if considering "its text, legislative history,

structure, and purpose, a statute is found to be plain in its meaning, then Congress has expressed

its intention, and deference is not appropriate."  *Li v. Renaud*, 654 F.3d 376, 382 (2d Cir. 2011)

(internal quotation marks omitted).  Where, as here, the nationwide regulation of non-depository

financial institutions is at stake, the court also "must be guided to a degree by common sense as

to the manner in which Congress is likely to delegate a policy decision of such economic and

political magnitude to an administrative agency."  *FDA v. Brown & Williamson Tobacco Corp.*,

529 U.S. 120, 133 (2000).

    1.    The NBA's Structure Demonstrates That
                Deposit Taking Is Central to the "Business of Banking"

The structure of the NBA confirms that Section 24 (Seventh)'s reference to the "business

of banking" necessarily includes deposit taking.  In particular, 12 U.S.C. § 27(a) ("Section

27(a)"), provides that a national bank "is not illegally constituted solely because its operations

are or have been required by the Comptroller of the Currency to be limited to those of a trust

company and the activities related thereto."  Such "trust banks" are *non-depository*.  *See*

*National Bank of Elizabeth, N.J. v. Smith*, 591 F.2d 223, 231 (3d Cir. 1979) (explaining that

national banks chartered under Section 27(a) are limited to providing fiduciary services).

At the time Section 27(a) was enacted, however, 12 U.S.C. § 92a already authorized

national banks chartered under Section 24 (Seventh) to exercise trust powers by special permit.

*See National Bank of Elizabeth*, 591 F.2d at 231-32.  Hence, if Congress had actually believed

that the OCC "already possessed the authority" to charter nondepository institutions under

Section 24 (Seventh) – as OCC now maintains – Section 27(a)'s targeted creation of *non-depository* trust banks "would have been superfluous." *American Land Title Ass'n v. Clarke*, 968 F.2d 150, 155 (2d Cir. 1992) (rejecting OCC's claim that Section 24 (Seventh) generally authorizes national banks to sell insurance; OCC's interpretation rendered another statutory provision meaningless); *see also Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000).  Ordinarily, courts "will not construe a statute in any way that makes some of its provisions surplusage."  *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985). The OCC's equally erroneous interpretation of Section 24 violates this rule.

In a similar vein, 12 U.S.C. § 27(b) (("Section 27(b)")), empowers the OCC to charter "bankers' banks," which are "limited charter institutions to be owned exclusively by depository institutions to provide services solely to depository institutions and their directors, officers, and employees."  S. Rep. No. 536, 97th Cong., 2d Sess. 27.  The statute granted the OCC special chartering authority because Congress believed that "[s]uch authority [was] necessary inasmuch as existing statutory restrictions appropriate for a full-service commercial banks [might] prove incompatible with the operation of these institutions."  *Id.* at 60.  Section 27(b) thus bluntly illustrates that – when it wants to – Congress knows how to create special purpose banks.

2.    The Fit of the NBA in the Overall Scheme of Federal Banking Law Demonstrates That the "Business of Banking" Must Include Deposit Taking.

Congress has enacted a multi-faceted banking regulatory scheme that includes a variety of regulatory agencies and federal statutes—including not only the NBA, but also the Federal Reserve Act ("FRA"), Federal Deposit Insurance Act ("FDIA"), and Bank Holding Company Act ("BHCA"). These statutes cannot be read in harmony unless the "business of banking" requires that national banks engage in receiving deposits. A different interpretation of the NBA

would disturb continuity across this regime by empowering OCC to create a separate class of entities that would evade the congressionally-intended application of other banking statutes.

Additionally, if "business of banking" is given the meaning argued by the OCC, it also would violate the well settled presumption that, absent congressional command to the contrary, terms in related statutes or the same administrative regime must be interpreted together, as symmetrical parts of a coherent regulatory structure.  *See, e.g., Sullivan v. Stroop*, 496 U.S. 478, 484-85 (1990); *see also ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988) (agencies may not exercise authority "in a manner that is inconsistent with the administrative structure that Congress enacted into law"). A court must ensure that the statutory provision under review is interpreted harmoniously with related statutes dealing with the same general subject and the same general principle, so as to give effect to a joint regulatory scheme. *Sullivan*, 496 U.S. at 484. To that end, comparable words used in different statutes on the same subject should be interpreted to have consistent meanings.  *Williams v. Taylor*, 529 U.S. 420 (2000); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context."); *see also Hawke*, 211 F.3d at 643 (citations omitted).

Here, the NBA is one of several statutes designed to provide a consistent structure across the banking industry and reflect the full extent of Congress's banking regulatory goals. *See, e.g.*, *Colo. Nat'l Bank v. Bedford*, 310 U.S. 41, 48 (1940) (recognizing that the NBA "correlated with the Federal Reserve Act, . . . has developed the present nationwide banking facilities").  Yet OCC does not even attempt to show that it possesses express Congressional authorization to depart from this comprehensive regime, in chartering institutions as national banks that do not take deposits. To the contrary, OCC's primary argument is that the Court's inquiry is limited

because "business of banking" is an "undefined and ambiguous statutory term," and that

because of this ambiguity OCC may race into an entirely new field, upend the present system of

state regulation of nondepository institutions, and preempt state law—a nonsensical conclusion

to which the Court should give no weight.  OCC Br. at 13.  The only interpretation of the

"business of banking" that ensures harmony among the federal banking statutes is one that

requires deposit taking.

      a.    Pursuant to the NBA, FDIA, And FRA, to Be Lawfully Entitled to  Commence
           the "Business Of Banking," a National Bank Must Receive Deposits

The interplay of the FRA, FDIA and the NBA makes clear that the "business of

banking" must include the taking of deposits.  First, the NBA requires that the applicant's

articles of association contain provisions "not inconsistent with the law." 12 U.S.C. § 21. After

the articles of association are submitted, the Comptroller must ensure that it is "lawfully entitled

to commence the business of banking." 12 U.S.C. § 26. If, after examination, it appears that the

association is "lawfully entitled to commence the business of banking," then the certificate is

issued. 12 U.S.C. § 27(a).

In turn, to comply with the NBA's requirement of "lawfully" engaging in the business of

banking, a national bank must become an "insured bank."  The Federal Reserve Act ("FRA")

requires national banks to, upon "commencing business," become members of the Federal

Reserve System and an insured bank under the FDIA. *See* 12 U.S.C. § 222.[7]

A national bank cannot become an insured bank without taking deposits. The FDIA

requires that a national bank be "engaged in the business of receiving deposits" in order to be

eligible to be an "insured bank." 12 U.S.C. § 1815(a)(1).  Since its inception the FDIC has

---

[7] A national bank that fails to become a Federal Reserve System member and an insured bank forfeits "all of the
rights, privileges, and franchises of such association granted to it under the National Bank Act." 12 U.S.C. § 501a.

insured deposits, while nondepository institutions have always remained under the supervision of the states.  Absent specific congressional authorization, therefore, a national bank must receive deposits in order to comply with the FRA and FDIA and thus be "lawfully entitled to commence the business of banking" under the NBA.

> b.   The "Business of Banking" Should Be Interpreted Consistently With the BHCA Definition of a "Bank," Which Encompasses Only Deposit-Taking Institutions

On the same logical basis, the "business of banking" must require deposit-taking in order to give full effect to the BHCA and the NBA's collective regulatory regime.  Congress defined a "bank" in the BHCA as a deposit-taking institution, and this Court should not read the NBA's comparable term "business of banking" to be in conflict.

Congress envisioned, in passing the two laws, that the BHCA and NBA would operate synchronously to fulfill the common purpose of restricting entry into the banking system and maintaining the separation of banking and commerce.  The BHCA defines a "bank" as an entity that, at a minimum, engages in the business of receiving deposits and whose deposits are insured.  12 U.S.C. §§ 1841(c)(1)(A) and (B).  It is this definition by which the BHCA defines the banking industry, and it is within the banking industry, so defined, that the NBA governs the chartering, regulation and activities of national banks. An entity that lies outside of the BHCA's definition of the banking industry is, therefore, necessarily outside of the NBA's grant of chartering authority.

The Supreme Court has expressly recognized the joint role that the NBA and BHCA play.  *See Whitney National Bank v. Bank of New Orleans & Trust Co*., 379 U.S. 411, 417-26 (1965) (OCC cannot approve a charter when it would violate the BHCA's terms or clearly intended policies).  Given this interplay between these two statutes, the prevailing definition of "bank" under the BHCA must be held to establish the "inner limits," *i.e.,* the required essential

elements, of what constitutes the "business of banking" under the NBA. *Indep. Bankers Ass'n of Am. v. Conover*, 1985 U.S. Dist. Lexis 22529, *33 (M.D. Fla. 1985); Symons, Edward L. Jr., *The "Business of Banking" in Historical Perspective*, 51 Geo. Wash. L. Rev. 676, 718 (1983). Thus, any definition of the "business of banking" under the NBA that does not require the taking of deposits plainly conflicts with the BHCA.

Additionally, the interpretation OCC advocates is directly contrary to Congress's purposeful action to close a statutory "nonbank bank loophole," which had permitted non-depository institutions to escape BHCA regulation. Congress passed the Competitive Equality in Banking Act of 1987 ("CEBA"), adding the "insured bank" prong to the definition of "bank" currently found in 12 U.S.C. § 1841(c). Prior to CEBA, the BHCA defined a bank as "any institution . . . which (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." This definition had the unintended effect of creating an implicit exemption for the chartering of "nonbank banks"—national banks that refrained from *either* accepting demand deposits or making commercial loans. By broadening the definition of "bank" to also include an "insured bank," Congress shut the nonbank loophole.

Cognizant that every national bank is required to become an insured bank (12 U.S.C. § 222), and that state banks are by definition insured banks (12 U.S.C. § 1813(a)(2)(A)), Congress intended that CEBA would act as a total ban on the chartering of any future nonbanks. Further, the inclusion of certain express exemptions for trust companies, credit card banks, and other specified institutions, coupled with the grandfathering of then-existing nonbanks, indicates a clear Congressional intention to prohibit OCC from granting national bank charters to institutions that do not qualify as banks under the BHCA.

3.     Common Sense Dictates that Deposit Taking Is
       Central to the "Business of Banking"

The Supreme Court has repeatedly and emphatically instructed that "national banks possess only the powers conferred by Congress," *Bedford*, 310 U.S. at 48, and that "powers not conferred by Congress are denied," *Texas & Pacific Ry. Co. v. Pottorff*, 291 U.S. 245, 253 (1934); *see also City of Yonkers v. Downey*, 309 U.S. 590, 595 (1940).  Against this back-drop, it makes little sense to think that Congress gave the OCC a blank slate upon which to identify the scope of all banking transactions regulated by federal charter.  The "business of banking" is at the center of the national economy, and although the OCC may have "discretion to authorize activities *beyond* those specifically enumerated" in Section 24 (Seventh), *NationsBank*, 513 U.S. at 258 n.2 (emphasis added), Congress reasonably requires a set of mandatory minimum activities that define a national banking institution.  As discussed below, when the OCC has desired to upset the regulatory regime that Congress has enacted—such as it did with the Fintech Charter Decision upsetting 150 years of the states' exclusive jurisdiction in chartering nondepository institutions—it must go to Congress.

That conclusion is especially compelling with regard to deposit taking.  After all, "[c]ommercial banks are unique among financial institutions in that they alone are permitted by law to accept demand deposits.  This distinctive power gives commercial banking a key role in the national economy."  *U.S. v. Philadelphia National Bank*, 374 U.S. 321, 326 (1963).  With decision-making of this magnitude, it cannot fairly be argued that Congress passively yielded the authority to define the "business of banking," now claimed by the OCC, through an ambiguity. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 159 ("Congress could not have intended to delegate a decision of such economic and political significance … in so cryptic a fashion").

In sum, *Chevron* deference "is called for *only* when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *Gen. Dynamic Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (emphasis added).  Here, intent is clear and no deference is warranted.

**B.  The OCC's Interpretation of the "Business of Banking" Is Unreasonable**

Assuming for the sake of argument, however, that the Court determines that the phrase "business of banking" is ambiguous, it should still reject the OCC's statutory construction as patently unreasonable.  "Deference does not mean acquiescence," and courts defer to agency interpretations "only if the administrative interpretation is reasonable." *Presley v. Etowah County Comm'n*, 502 U.S. 491, 508 (1992).  By any measure, Section 5.20(e)(1) is an invalid exercise of administrative authority.

1.  OCC's Interpretation of Section 5.20(e)(1)'s Is Unreasonable
Because It Fundamentally Changes the OCC's Regulatory Role

An agency's interpretation of a statute is unreasonable if "it would bring about an enormous and transformative expansion of the [agency's] regulatory authority without clear congressional authorization." *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014); *see also MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, 229 (1994) (agency's statutory interpretation "can be justified only if it makes a less than radical or fundamental change to the Act[]").  Section 5.20(e)(1) is not OCC's innovative application of long-standing legislation. "What we have here, in reality, is a fundamental revision of the statute." *MCI Telecomm. Corp.*, 512 U.S. at 231.

As alleged in the complaint, by authorizing itself through Section 5.20(e)(1) to grant non-depository charters, the OCC "would upend almost one and a half centuries of established federal banking law and displace a nation of 50 state financial regulators that annually supervise hundreds of billions of dollars in non-bank transactions."  Complt ¶ 25.  Courts have long

rejected such administrative power grabs. "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, . . . [judges] typically greet its announcement with a measure of skepticism." *Utility Air Regulatory Group*, 134 S. Ct. at 2444 (internal quotation marks and citations omitted).

Because Section 5.20(e)(1) "effectively . . . introduc[es] . . . a whole new regime of regulation," *MCI Telecomm. Corp.,* 512 U.S. at 234, the skepticism to be applied is piercing. The OCC's wholly unreasonable interpretation of Section 24 (Seventh) means *Chevron* deference cannot save it.

> 2.    The OCC's Rationale for Section 5.20(e)(1) is Unreasonable

Ignoring Section 5.20(e)(1)'s radical impact, OCC innocuously contends that "it reasonably interpreted the term 'business of banking' to mean that the conduct of one of three statutorily identified 'core activities' suffices to make an applicant eligible for a national bank charter." OCC Br. at 19. The agency plucked those activities – identified in the disjunctive as "'deposits … received, *or* checks paid, *or* money lent'" – from an inapposite 12 U.S.C. § 36(j) ("Section 36(j)") (emphasis added). Section 36(j) defines a national bank "branch." *Id.* In support of this rationale, OCC relies heavily upon *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987). *See* OCC Br. at 19-20. In *Clarke*, the Supreme Court looked to the act's branch banking provisions in order to construe 12 U.S.C. § 81 ("Section 81"), which contains the statutory limitations on where national banks can operate.

OCC's convoluted reasoning is erroneous on its face.[8] Although there is a rational nexus between the definition of a bank "branch" and the limitations upon where national banks may

---

[8] Courts "are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle." *Northeast Beverage Corp. v. NLRB*, 554 F.3d 133, 138 n.* (D.C. Cir. 2009) (internal quotation marks omitted). Nor, certainly, does *Chevron* "help an agency that rests its decision on a misinterpretation of Supreme Court precedent, as the [agency] did here." *Jacoby v. NLRB*, 233 F.3d 611, 613 (D.C. Cir. 2000).

conduct business, there is no defensible connection between what constitutes a bank branch and the essential functions that an institution must perform in order to receive a national bank *charter*.  Instead, Section 36(j)'s disjunctive selection of banking activities has everything to do with the historic business rivalry between national and state banks – a pivotal fact that OCC buried in haste to expand its authority.

Congress indisputably "intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned."  *First Nat'l Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 261 (1966); *see also First Nat'l Bank in Plant City v. Dickinson*, 396 U.S. 122, 136 (1969) ("the purpose of the [federal branching] statute is to maintain competitive equality").  True to that legislative command, the Supreme Court has firmly instructed that "the definition of 'branch' in [the NBA] must not be given a restrictive meaning which would frustrate . . . congressional intent."  *First Nat'l Bank in Plant City*, 396 U.S. at 134.  The Court further stressed that the definition's reference to deposit taking, check cashing, *or* making loans "is phrased in the disjunctive," thereby ensuring that "the offering of any one of the three services mentioned . . . will provide the basis for finding that 'branch' banking is taking place."  *Id*. at 135.  The Court understood this disjunctive definition both as a statutory mechanism designed to check any "systemic attempt to secure for national banks branching privileges which [a state] denied to competing state banks," *id.* at 138, and a way of "preventing the perceived dangers of unlimited branching," *Clarke*, 479 U.S. at 402.

As such, Section 36(j)'s enumeration of three distinct banking functions has *nothing* to do with the essential chartering requirements imposed by Section 24 (Seventh).  Indeed, the relevant branching specifications of the NBA were not enacted until 1927, *see First Nat'l Bank of Logan*, 385 U.S. at 257, some 64 years after the phrase "business of banking" was first incorporated into

the statute, *cf. MCI Telecomm. Corp.,* 512 U.S. at 228 ("the most relevant time for determining a

statutory term's meaning" is the date of its enactment).   There is no link between the two

provisions either in purpose or time, and the OCC's attempt to make that connection in Section

5.20(e)(1) simply stretches the law too far.   Because "an agency's interpretation of a statute is

not entitled to deference when it goes beyond the meaning that the statute can bear," the OCC's

reasoning should be rejected.   *Id.* at 229.[9]

C.   **Attempts by the OCC to Unlawfully Extend Its Authority and Charter Entities That Would Not Carry on the "Business of Banking" Have Routinely Been Struck Down by the Courts.**

This is not the first time OCC has exceeded the limits of its chartering authority.  Each

time, the courts rejected those efforts, concluding that OCC is not empowered by the NBA to

charter such institutions unless specifically authorized by Congress. OCC is permitted to charter

a national bank only: (1) where the institution is organized to carry on "the business of banking,"

which necessarily includes taking deposits, or (2) where Congress has taken specific legislative

action to allow for the chartering of an entity to carry on a special purpose.

OCC's authority to charter one category of special-purpose national banks—trust

banks—derives from a specific amendment to the NBA enacted in 1978, presently codified at 12

U.S.C. § 27(a).  Before this amendment, a federal court struck down OCC's attempt to charter a

supposed national bank whose activities would be limited to the fiduciary services provided by a

trust company, holding that OCC lacked the authority to charter an institution that would not

engage in any of the banking powers enumerated in Section 24 (Seventh) of the NBA. *National

State Bank v. Smith*, No. 76- 1479, 1977 U.S. Dist. LEXIS 18184 (D.N.J. Sept. 16, 1977).  By

---

[9]  Inexplicably, while embracing irrelevant judicial authority as support for it actions, the OCC dismisses as "not entitled to weight" the only two cases that have ever squarely addressed whether the agency is empowered to charter non-depository institutions under the general authority of Section 24 (Seventh).  *See* OCC Br. at 21-22.  The district courts in both *Conover*, 1985 U.S. Dist Lexi 22539, and *Nat'l State Bank of Elizabeth, NJ*, 591 F.2d at 227, held that the OCC lacked any such authority.  These decisions remain undisturbed and thus good law.

amending the NBA to allow for the chartering of national trust banks, Congress effectively acknowledged the validity of the *National State Bank* ruling.[10]

Following *National State Bank*, court action was once again needed to block OCC's efforts to issue special-purpose charters beyond its express congressionally granted authority.  In *Conover*, the court granted an injunction prohibiting OCC from issuing charters to institutions that either did not accept demand deposits or make commercial loans.  *Conover*, 1985 U.S. Dist. LEXIS 22529. The court held that the activities mentioned in the definition of "bank" in the BHCA, as amended in 1970, "represent[] a recognition by Congress that the acceptance of demand deposits and the making of commercial loans constitute the historic core activities of banks and the essence of the business of banking." *Id*. at *31. The court likewise noted that it must "favor statutory construction which enables statutes to complement one another" and construe banking statutes "together to give effect to a joint regulatory purpose." *Id.* at *33. Applying these principles, the court concluded "a financial institution that is legally unable to engage in both activities cannot engage in the 'business of banking' within the meaning of the NBA." *Id.*

The court relied on the history of the amendments to the NBA authorizing the chartering of trust companies and bankers' banks:

> It is clear that when Congress has wanted to expand the authority of the Comptroller to charter national associations that are not to be engaged in the business of banking, it has done so through specific amendments. If Congress had intended that the Comptroller have broad chartering authority over various types of financial institutions, there would have been no need for the trust company and bankers' bank amendments, and those amendments would not have been narrowly drawn.

---

[10] OCC's power to charter the second category of special-purpose banks—banker's banks—is also derived from a direct Congressional grant of authority in 1982 with the further amendment of Section 27 of the NBA. Section 27(b) was added as another narrow addition to the Comptroller's chartering authority. See Pub. L. 97-320, title IV, § 404(a), Oct. 15, 1982, 96 Stat. 1511.

*Id.* at *35.  Following OCC's defeat in *Conover*, Congress declined to adopt legislation extending to OCC the special-purpose chartering authority it had attempted to assert with respect to "nonbank banks."

OCC, in part, relies on their authority to charter credit card banks, but explicit authority is not necessary there because credit card banks do engage in deposit-taking activities and are FDIC insured.  *See, e.g.*, 12 U.S.C. §§ 1841(c)(2)(F) (contemplating that credit card banks accept "savings or time deposit[s]" and maintain one office "that accepts deposits"). As entities that engage in deposit-taking (and unlike the fintech entities at issue here), credit card banks carry on the "business of banking" as defined under existing law, and therefore fall squarely within OCC's chartering authority. OCC further cites *Indep. Cmty. Bankers Assoc. v. Bd. of Governors of the Fed. Reserve Sys.*, 820 F.2d 428 (D.C. Cir. 1987) ("*ICBA v. FRB*"), for the proposition that they are authorized to issue limited purpose charters. OCC Br. at 17-18.  But the holding in *ICBA v. FRB* is simply that a national bank that qualifies as a "bank" under the BHCA may limit its activities to less than the full scope of activities permissible for national banks. The court did not hold, as OCC asserts, that a national bank may limit its activities to the point that it no longer qualifies as a "bank" carrying on the "business of banking."  The court was not faced with the question of whether or not deposit taking was required to be engaged in the "business of banking": the credit card bank at issue indisputably took deposits.  *See ICBA v. FRB*, 820 F.2d at 439.

## POINT III:   DFS's FACIAL CHALLENGE TO SECTION 5.20(e)(1) IS TIMELY

By its Fintech Charter Decision, the OCC has attempted for the first time to extend its authority to chartering nondepository institutions by its interpretation of Section 5.20(e)(1). This regulation has never before been understood to apply to these institutions.  Thus DFS' challenge is clearly timely, as the Fintech Charter Decision was issued only several months prior to when

the Complaint in this case was filed.  OCC tries to sidestep the Superintendent's direct challenge to Section 5.20(e)(1) by invoking the six-year statute of limitations that generally governs APA actions.  *See* OCC Br. at 9-10.  Because the relevant amendment to that regulation was promulgated by OCC in 2004, the agency maintains that Count II of the complaint is time-barred.  *See id.* at 10.  OCC is mistaken.

It is firmly established that when "a final agency action is presented for review, intermediate actions leading up to that final action are reviewable as well."  *Citizens Against Casino Gambling in Erie County v. Chaudhuri*, 802 F.3d 267, 279 (2d Cir. 2015) (internal quotation marks omitted); *Indep. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999).  With regard to the Fintech Charter Decision, the amendment of Section 5.20(e)(1) in 2004 is clearly an "intermediate" agency action.  In fact, as OCC concedes, *see Summary of Comments*, Cmplt. Ex. H at 14-15, the Fintech Charter Decision rests entirely upon the chartering authority purportedly afforded by that amended regulation.  The Superintendent's challenge to Section 5.20(e)(1) is *not* time-barred.

**POINT IV:    DFS HAS ALLEGED A VALID TENTH AMENDMENT CLAIM**

Finally, the OCC maintains that neither Section 5.20(e)(1) nor the Fintech Charter Decision "run[s] afoul of the Tenth Amendment" because "the Supremacy Clause operates in concert with the National Bank Act to displace state laws or state causes of action that conflict with federal law or that prevent or significantly interfere with national bank powers."  OCC Br. at 23.  This is a serving of classic red herring, as there is no dispute that *valid* federal regulations may preempt state laws without raising Tenth Amendment concerns.

There is nothing valid here about the OCC's unabashed power grab.  The Supreme Court has stressed that a "federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority, for an agency literally has no power to act,

let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *New York v. FERC*, 535 U.S. 1, 18 (2002) (internal quotation marks, brackets, and ellipsis omitted).  Moreover, "because the States are independent sovereigns in our federal system, [courts] have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996).  In cases "in which Congress has legislated ... in a field which the States have traditionally occupied, [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotation marks and citations omitted).

The Complaint alleges that the OCC acted beyond its statutory authority under the NBA by promulgating Section 5.20(e)(1) and issuing the Fintech Charter Decision.  *See* Cmplt. ¶¶ 25, 61.  It also alleges that the "Fintech Charter Decision conflicts with state law insofar as it claims to insulate OCC-chartered non-depository institutions from state regulation" and, moreover, that Congress "did not intend to preempt state regulation of such entities." *Id* at ¶¶ 60-61. These allegations state an actionable claim under the Tenth Amendment because, without legislative authorization, OCC is powerless to preempt state law.  *See New York*, 535 U.S. at 18.

## CONCLUSION

For the reasons stated above, the Court should deny the OCC's motion to dismiss the complaint in all respects.

Date: September 25, 2017                              Respectfully submitted,

/s/ Matthew L. Levine
MATTHEW L. LEVINE
Executive Deputy Superintendent for Enforcement
New York State Department of Financial Services
One State Street New York, NY 10004
Tel.: (212) 709-5461; Matthew.Levine@dfs.ny.gov
*Attorney for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Local Rule 6.1, I certify that on September 25, 2017, a true and correct copy of the foregoing Memorandum Of Law In Opposition To Defendants' Motion To Dismiss The Complaint was served on all counsel of record through the Court's CM/ECF system.

/s/ Matthew L. Levine
MATTHEW L. LEVINE
Executive Deputy Superintendent for Enforcement
New York State Department of Financial Services
One State Street New York, NY 10004
Tel.: (212) 709-5461; Matthew.Levine@dfs.ny.gov
*Attorney for the Plaintiff*