UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MARIA T. VULLO, in her official
capacity as Superintendent of the
New York State Department of
Financial Services,

                    Plaintiff,

          - against -

OFFICE OF THE COMPTROLLER OF THE
CURRENCY, JOSEPH M. OTTING, in his
official capacity as U.S.
Comptroller of the Currency,[1]

                    Defendants.
----------------------------------X

**MEMORANDUM AND ORDER**

17 Civ. 3574 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

## I.  INTRODUCTION

In this case, plaintiff Maria Vullo, in her capacity as Superintendent of the New York State Department of Financial Services ("DFS"), challenged the so-called "Fintech Charter Decision": the purported decision of defendant Office of the Comptroller of the Currency ("OCC") to grant special-purpose national bank ("SPNB") charters to financial technology ("fintech") companies. Defendants have moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), Joseph M. Otting, the Comptroller of the Currency as of November 27, 2017, is substituted as a defendant in this action in place of former Acting Comptroller of the Currency Keith A. Noreika.

1

for lack of subject matter jurisdiction and failure to state a claim.  Since the OCC has not reached a final "Fintech Charter Decision," defendants' 12(b)(1) motion is granted as plaintiff has suffered no injury in fact as required for Article III standing and because plaintiff's claims are not ripe.

## II.   BACKGROUND

**A. Factual Background**

    **1.   Parties**

Plaintiff Maria Vullo is the Superintendent of DFS, the agency responsible for enforcing New York State's banking, financial services, and insurance laws.  Compl. ¶¶ 16-18.  DFS licenses and supervises 288 state and international banks and approximately 600 non-bank financial services firms, including companies that use technology as a core part of their business to lend or transfer money.  Compl. ¶ 10; Id. Ex. C, pp. 1-2.

Defendant OCC is a bureau of the United States Department of the Treasury and operates as the primary supervisor of federally chartered banks in the United States.  Compl. ¶ 19.  OCC approval is required to establish a national bank.  Compl. ¶¶ 21, 24; 12 C.F.R. § 5.20.

    **2.   The OCC's Amendments to 12 C.F.R. § 5.20(e)(1)**

In 2003, the OCC adopted a final rule amending 12 C.F.R. § 5.20(e)(1) to provide that a national bank "may be a special purpose bank that limits its activities to fiduciary activities or

to any other activities within the business of banking." Compl. ¶ 24; see Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations; Real Estate Lending and Appraisals, 68 Fed. Reg. 70122-01 (Dec. 17, 2003). The amended regulation, which became effective January 16, 2004, provides that "[a] special purpose bank that conducts activities other than fiduciary activities must conduct at least one of the following core banking functions: Receiving deposits; paying checks; or lending money." 12 C.F.R. § 5.20(e)(1)(i); Compl. ¶ 24.

### 3. Comptroller Curry's Fintech Charter Proposal

Under Thomas J. Curry, who was appointed Comptroller of the Currency by President Obama in April 2012, the OCC began considering the possibility of issuing SPNB charters under the amended 12 C.F.R. § 5.20(e)(1) to fintech companies. Compl. ¶¶ 28-39.

In August 2015, Comptroller Curry announced an initiative to create a framework to improve the OCC's ability to identify and understand trends and innovations in the financial services industry. This "responsible innovation" initiative focused on the evolving needs of consumers of financial services, with a focus on regulating developments in the fintech sector. The following year, the OCC published the March 2016 White Paper, which elaborated on Comptroller Curry's vision for the agency to adopt its regulatory framework to reflect changes in the fintech sector. Compl. ¶ 28;

Office of the Comptroller of the Currency, "Supporting Responsible Innovation in the Federal Banking System:  An OCC Perspective" (Mar. 2016) ("March 2016 White Paper"), Compl. Ex. A., p. 4.

The first indication that the OCC was considering issuing SPNB charters to fintech companies came in the context of a proposed rule that addressed receiverships for national banks that are not insured by the FDIC.  Compl. ¶ 29; Receiverships for Uninsured National Banks, 81 Fed. Reg. 62,835 (Sept. 13, 2016). Citing 12 C.F.R. § 5.20(e)(1), the OCC stated that it "may charter other special purpose banks with business models that are within the business of banking," and that "as part of the agency's initiative on responsible innovation in the Federal banking system, the OCC is considering how best to implement a regulatory framework that is receptive to responsible innovation, such as advances in financial technology."  Compl. ¶ 29; 81 Fed. Reg. 62,835, 62,837.

In December 2016, the OCC published another white paper that asked for comments from the public as to "whether it would be appropriate for the OCC to consider granting a special purpose national bank charter to a fintech company."  Compl. ¶ 30; Office of the Comptroller of the Currency, "Exploring Special Purpose National Bank Charters for Fintech Companies" (Dec. 2016) ("December 2016 White Paper"), Compl. Ex. B, p. 2.  The OCC explained that it was considering various categories of fintech

companies, including marketplace lenders that provide loans to consumers and small businesses, companies that provide payment-related services, businesses that engage in digital currencies and distributed ledger technology, and companies that provide financial planning and wealth management products and services. Dec. 2016 White Paper, p. 4.  At the end of the white paper, the OCC asked for responses from the public to thirteen questions about the potential benefits and risks of issuing special purpose national bank charters to fintech companies.  Id., pp. 15-16.

Over 100 individuals and institutions provided comments in response, including DFS, which objected to the proposal because it would invite risk of regulatory confusion and uncertainty, stifle small business innovation, create institutions that are too big to fail, threaten state consumer protection laws, and increase the risks presented by nonbank entities.  See Compl. ¶ 31; Letter from Superintendent Maria T. Vullo to Comptroller Thomas J. Curry (Jan. 17, 2017) ("First DFS Letter"), Compl. Ex. C.[2]  In this letter, DFS acknowledged that it was responding to the OCC's proposal, rather than to a final decision.  See First DFS Letter, p. 8 ("NY

---

[2]     Other objecting parties included the Conference of State Banking Supervisors, the Independent Community Bankers of America, U.S. Senators Sherrod Brown and Jeffrey A. Merkely, and the Illinois Department of Financial and Professional Regulation.  Compl. ¶¶ 31-33 & Exs. D-G.  Several individuals and institutions also offered comments in support of the proposal.  See generally Office of the Comptroller of the Currency, "Public Comments on Exploring Special Purpose National Bank Charters for Fintech Companies," https://www.occ.gov/topics/responsible-innovation/fintech-charter-comments.html.

DFS opposes any <u>new</u> regulatory regime that impacts state regulation and the protection of our consumers and markets.  The <u>proposed</u> OCC special purpose charter fails on each ground.") (emphasis added).

On March 6, 2017, Comptroller Curry gave a speech that highlighted the risks presented by evolving technology in the fintech industry and the promises of responsible innovation in this sector to expand financial inclusion for low-income individuals.  Remarks by Thomas J. Curry, Comptroller of the Currency, at LendIt USA 2017 (Mar. 6, 2017) ("LendIt Speech"), Compl. Ex. J.  After referring to the many comments the OCC had received in response to its proposal, Comptroller Curry stated, "We will be issuing charters to fintech companies engaged in the business of banking because it is good for consumers, businesses, and the federal banking system."  Compl. ¶ 38; LendIt Speech, p.5.

This speech provided only vague details about the application criteria or process.  <u>See</u> LendIt Speech, p. 7 ("The OCC will not approve charter proposals from any company that plans to offer financial products and services with predatory or abusive features."); <u>id.</u> ("We expect fintech applicants for national bank charters to include in their business plans a description of how they will support the needs of the communities they serve and promote financial inclusion as a federally chartered institution."); <u>id.</u>, p. 8 ("Proposals that would mix banking and commerce are inconsistent with the OCC's chartering standards and

would not be approved.").  Comptroller Curry also noted that the OCC was still "working to publish a supplement to our existing Licensing Manual that will clarify our approach to evaluating applications from fintech companies."  Id., p. 5.

Later that same month, on March 15, 2017, the OCC released two documents simultaneously:  the "OCC Summary of Comments and Explanatory Statement:  Special Purpose National Bank Charters for Financial Technology Companies" ("Summary of Comments") and the "Comptroller's Licensing Manual Draft Supplement:  Evaluating Charter Applications From Financial Technology Companies" ("Draft Supplement").

The Summary of Comments explained that commenters had provided both positive and negative feedback about the possibility of issuing SPNB charters to fintech companies, but that "the OCC believes that making SPNB charters available to qualified fintech companies would be in the public interest."  Summary of Comments, Compl. Ex. H, p. 3.  It concluded:  "These comments informed our development of the draft Supplement, which explains how the OCC would evaluate applications from fintech companies for SPNB charters.  For more information about the envisioned application process for fintech companies seeking an SPNB charter, please refer to the [Draft Supplement]."  Id., p. 15.

The Draft Supplement describes the process by which a fintech company would apply for an SPNB Charter.  It states that the OCC

7

had "determined that it is in the public interest to consider applications for a special purpose national bank (SPNB) charter from financial technology (fintech) companies that engage in banking activities and that meet the OCC's chartering standards." Compl. ¶ 37; Draft Supplement, Compl. Ex. I, p. 1.  The bottom of each page of the Draft Supplement is clearly labeled "draft," and the Summary of Comments calls for further comments on the Draft Supplement by April 14, 2017.   Draft Supplement; Summary of Comments, p. 15.  In fact, DFS seized the opportunity to do so and sent the OCC another letter that repeated its objections to issuing SPNB charters to fintech companies and objected to the application framework described in the Draft Supplement.  Compl. ¶ 39; Letter from Superintendent Maria T. Vullo to Comptroller Thomas J. Curry (Apr. 14, 2017) ("Second DFS Letter"), Compl. Ex. K.

### 4.   The Fintech Proposal under Acting Comptroller Noreika and Comptroller Otting

Mr. Curry stepped down as Comptroller of the Currency on May 5, 2017, and President Trump named Keith Noreika Acting Comptroller of the Currency that same day.  The instant lawsuit was filed one week later, on May 12, 2017.[3]

---

[3]   Approximately two weeks earlier, on April 26, 2017, the Conference of State Bank Supervisors had filed a similar lawsuit in the District Court for the District of Columbia challenging the OCC's ability to create a special-purpose national bank charter for fintech companies.  See Conference of State Bank Supervisors v. Office of the Comptroller of the Currency, No. 17-763 (D.D.C. 2017).  Defendants' motion to dismiss in that case is pending.

In three separate speeches since this lawsuit was filed, Acting Comptroller Noreika represented that he had not reached a final decision about whether to issue SPNB charters to fintech companies.  Acting Comptroller Noreika first addressed this topic in a July 19, 2017 speech, where he stated that he thought issuing federal bank charters to fintech companies was a "good idea" and that he understood that the OCC had authority to issue these charters.  Remarks by Keith A. Noreika, Acting Comptroller of the Currency, before the Exchequer Club (July 19, 2017) ("Exchequer Speech"), p. 5 ("[C]ompanies that offer banking products and services should be allowed to apply for national bank charters so that they can pursue their businesses on a national scale if they choose, and if they meet the criteria and standards for doing so.") (emphasis in original).

In the same speech, Acting Comptroller Noreika stated:

> [A]t this point, the OCC has not determined whether it will actually accept or act upon applications from nondepository fintech companies for special purpose national bank charters that rely on this regulation. And, to be clear, we have not received, nor are we evaluating, any such applications from nondepository fintech companies.  The OCC will continue to hold discussions with interested companies while we evaluate our options.

Id., p. 9 (emphasis in original).  As a potential alternative, Acting Comptroller Noreika suggested that fintech companies could apply for other federal charters that are not being challenged in

9

this litigation, including for national banks, trust banks, banker's banks, and CEBA credit card banks.  Id.

In two subsequent speeches, Acting Comptroller Noreika repeated that the OCC has not yet decided whether it will issue SPNB charters to fintech companies.  See Remarks by Keith A. Noreika, Acting Comptroller of the Currency, before Georgetown University's Fintech Week (Oct. 19, 2017) ("GUFW Speech"), p. 7 ("As for our initiative to use our authority to charter nondepository fintech companies, that remains a work in progress, and as you know that authority is also being challenged by the Conference of State Bank Supervisors and the New York Department of Financial Services.  Although we will defend our authority vigorously, we have not decided whether we will exercise that specific authority."); Remarks by Keith A. Noreika, Acting Comptroller of the Currency, before the Online Lending Policy Summit (Sept. 25, 2017) ("OLPS Speech"), p. 7 ("As you know, the Conference of State Bank Supervisors and the New York Department of Financial Services have challenged the OCC's authority in this area.  We have filed our responses in both cases and will continue to defend our authority vigorously.  We have not, however, decided whether we will exercise that specific authority to issue special purpose national bank charters to nondepository fintech companies.").

Joseph M. Otting, who was nominated by President Trump as Comptroller of the Currency in June 2017, was confirmed by the Senate on November 16, 2017, and sworn into office on November 27, 2017.  The parties have not cited, and the Court has not otherwise identified, any statement by Mr. Otting in any capacity that indicates his position on whether to issue SPNB charters to fintech companies.  See Oral Arg. Tr. (Nov. 21, 2017) 19:24-20:5.

**B. Procedural History**

Plaintiff filed this lawsuit on May 12, 2017, asserting three claims:  (1) the OCC's "Fintech Charter Decision" exceeds the OCC's authority under the National Banking Act ("NBA"); (2) 12 C.F.R. § 5.20(e)(1) is null and void because it exceeds the OCC's authority under the NBA; and (3) the "Fintech Charter Decision" violates the Tenth Amendment to the U.S. Constitution.  Compl. ¶¶ 49-62.  Plaintiff seeks declaratory relief and a permanent injunction preventing defendants from implementing the "Fintech Charter Decision."  Id. ¶¶ 63-67.

Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim.  Defendants argue that the Court lacks subject matter jurisdiction over DFS's claims because plaintiff lacks standing, plaintiff's claims are not ripe, and plaintiff's second claim is time-barred.  On the merits, defendants argue that there has been no final agency action for the Court to

review under the APA, and that the OCC has statutory and constitutional authority to issue SPNB charters to fintech companies.

### III. <u>DISCUSSION</u>

**A. 12(b)(1) Standard**

Where a defendant moves for dismissal under Rule 12(b)(1) and 12(b)(6), the Court must address the 12(b)(1) motion first. <u>See</u> <u>Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n</u>, 896 F.2d 674, 678 (2d Cir. 1990) (holding that, in the absence of subject matter jurisdiction, "the accompanying defenses and objections become moot and do not need to be determined"). To defeat a 12(b)(1) motion, a plaintiff must establish subject matter jurisdiction by a preponderance of the evidence. <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. <u>Conyers v. Rossides</u>, 558 F.3d 137, 143 (2d Cir. 2009). The Court may review evidence outside the pleadings to determine whether jurisdiction exists. <u>Makarova</u>, 201 F.3d at 113.

**B. The Absence of a "Fintech Charter Decision"**

Defendants assert that the Court lacks subject matter jurisdiction over plaintiff's claims because these claims seek to remedy speculative harms from action that the OCC may never take. As a result, defendants argue that the Court should dismiss this

case on two related grounds:  1) DFS lacks Article III standing because DFS's potential injuries are inchoate unless and until the OCC issues an SPNB charter to a fintech company; and 2) the absence of a final decision means this matter is not ripe for judicial review.

All three of plaintiff's claims are grounded on the premise that there is a "Fintech Charter Decision" subject to challenge.[4] However, the OCC has not yet determined whether it will issue SPNB charters to fintech companies, nor has it received or reviewed any applications for any such charter.

To support its position that a "Fintech Charter Decision" has been reached, DFS relies on several OCC documents – in particular, the December 2016 White Paper, Comptroller Curry's March 2017 LendIt Speech, the March 2017 Summary of Comments, and the March 2017 Draft Supplement.  These documents actually support the opposite conclusion.

---

[4]    Plaintiff's first and third claims respectively allege that the "Fintech Charter Decision" exceeds the OCC's authority under the NBA and violates the Tenth Amendment.  On its face, plaintiff's second claim challenges the OCC's 2003 amendment to 12 C.F.R. § 5.20(e)(1) as null and void because it exceeds the OCC's authority under the NBA.  However, plaintiff clarifies in the opposition to the motion to dismiss that this claim also relies on the existence of the "Fintech Charter Decision," through which "the OCC has attempted for the first time to extend its authority to chartering nondepository institutions by its interpretation of Section 5.20(e)(1)."  (ECF No. 22, pp. 28-29.)  Without the "Fintech Charter Decision," plaintiff does not contest that a facial challenge to § 5.20(e)(1), which became effective in 2004, would be time-barred by the APA's six-year statute of limitations.  See 28 U.S.C. § 2401(a).

The December 2016 White Paper repeatedly made clear that the OCC had not yet decided whether it was going to grant SPNB charters to fintech companies.  December 2016 White Paper, p. 1 ("This paper . . . articulates what the OCC considers to be necessary conditions if the OCC is to exercise [the authority to grant special purpose national bank charters to fintech companies]. . . .  Public comment will help inform our consideration of these issues."); id. at 14 ("The OCC likely would impose additional conditions in connection with granting a special purpose national bank charter requested by a fintech company based on the fintech company's business model and risk profile.") (emphasis added); id. at 15 ("As the OCC considers the granting of special purpose national bank charters to fintech companies, it seeks feedback on all aspects of this paper.").  DFS explicitly acknowledged that the December 2016 White Paper was not final by responding to the OCC's call for comments with objections to what it described as the "proposed 'fintech' charter."  See First DFS Letter, p. 8 (emphasis added).

DFS places particular emphasis on three documents from March 2017:  the LendIt Speech, the Summary of Comments, and the Draft Supplement.  While the Comptroller's LendIt Speech can reasonably be understood as suggesting that the OCC more likely than not would eventually grant these charters, Comptroller Curry also noted that the OCC was still "working to publish a supplement . . . that will

14

clarify our approach to evaluating applications from fintech companies." LendIt Speech, p. 5. The OCC's Draft Supplement to the Comptroller's Licensing Manual is labeled "draft" on the bottom of each page, and the accompanying Summary of Comments calls for comments on the Draft Supplement, further demonstrating that the application process was still a work in progress at the time these documents were published in March 2017. Draft Supplement; Summary of Comments, p. 15.

DFS again acknowledged that there was no final "Fintech Charter Decision" in the comments it submitted to the OCC in April 2017. Second DFS Letter, p. 1 ("In publishing the Manual, the OCC apparently has ignored these serious questions and concerns and has made clear that it intends to proceed – without authority – to seek to charter nonbank financial institutions . . . .") (emphasis added); id., p. 3 ("[T]he OCC's Manual, if allowed to proceed . . . .) (emphasis added); id., p. 5 ("[T]he OCC irrationally seeks to create an unauthorized and hasty loophole for fintech companies . . . .") (emphasis added).

At oral argument, plaintiff argued in response that there has been a "Fintech Charter Decision" because the OCC has unequivocally stated that it has the authority to issue SPNB charters to fintech companies. See Oral Arg. Tr. 5:18-23. Even if true, this assertion alone is insufficient – the OCC's determination that it

has the power to issue these charters does not mean that the OCC has decided to exercise that power.

Plaintiff also contended at oral argument that the OCC has laid out a clear path for interested fintech companies to engage with the OCC regarding their charter applications.  Plaintiff asserts that the OCC's Licensing Manual describes a four-stage process for licensing, the December 2016 White Paper says the four-stage process will apply for fintech companies, and then the Draft Supplement establishes the exact procedure companies must follow. See Oral Arg. Tr. 3:23-5:10.  The fundamental flaw with this argument is that the Draft Supplement, which has the word "draft" stamped on the bottom of every page, does not provide companies with authoritative guidance.

Plaintiff argues that we would improperly elevate form over substance if we ended our inquiry here merely because the OCC used the word "draft."  See Appalachian Power CO. v. E.P.A., 208 F.3d 1015, 1022-23 (D.C. Cir. 2000) (holding that a document titled "EPA Draft Final Periodic Monitoring Guidance" provided emission standards that the States were obligated to follow).  However, the Draft Supplement is no more final in substance than it is in form. The Summary of Comments calls for comments on the Draft Supplement from interested parties.  Summary of Comments, p. 15.  DFS and others offered critical comments on the Draft Supplement, and no final Supplement has ever been published.  See Second DFS Letter.

16

Moreover, without a final decision that such licenses will be considered and potentially granted, the application process remains purely hypothetical.  Indeed, any potential applicants appear to understand that there is no application process currently in place, as the OCC represents that no fintech company has submitted an application for an SPNB charter.  See Oral Arg. Tr. 3:6-10.  We therefore find that at the time this lawsuit was filed in May 2017, the OCC had not reached a "Fintech Charter Decision."

This finding is reinforced by the OCC's actions over the last seven months.  The proposed issuance of SPNB charters to fintech companies, a policy first discussed by an appointee of President Obama, has become increasingly uncertain under President Trump's two Comptrollers of the Currency, Keith Noreika and Joseph Otting. During his tenure, Acting Comptroller Noreika repeatedly stated that the OCC "has not determined whether it will actually accept or act upon applications from non-depository fintech companies for special purpose national bank charters that rely on this regulation."  Exchequer Speech, p. 9; see also OLPS Speech, p. 7; GUFW Speech, p. 7.  Plaintiff correctly points out that Acting Comptroller Noreika's statements must be viewed with a critical eye because they were made after this lawsuit had been filed.  We cannot, however, dismiss these statements as contrary to the OCC's true position on this issue.  Finally, as far as the Court is aware, Comptroller Otting has not taken a public position on the

issue.  See Oral Arg. Tr. 19:24-20:5.  No action taken by any of his predecessors binds him or the agency.

Having considered the entire record, we find that the OCC has not reached a "Fintech Charter Decision."  We now address defendants' motion to dismiss on standing and ripeness grounds.

**C. Standing**

Article III of the Constitution requires that a plaintiff establish standing in order for a case to be justiciable.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992).  The irreducible constitutional minimum of standing contains three elements:  injury in fact, causation, and redressability.  Id. at 560-61.  The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements for each claim asserted.  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).  The standing inquiry is "especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013) (quoting Raines v. Byrd, 521 U.S. 811, 819-20 (1997)).

Defendants' arguments focus on the absence of an injury in fact, "the first and foremost of standing's three elements."  Spokeo, 136 S. Ct. at 1547.  An injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or

hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks omitted). "[T]hreatened injury must be certainly impending to constitute injury in fact . . . allegations of possible future injury are not sufficient." Clapper, 568 U.S. at 409 (emphasis in original) (internal quotation marks omitted).

DFS identifies four purported injuries directly attributable to the "Fintech Charter Decision": 1) New York-licensed money transmitters may escape New York's regulatory requirements, stripping their customers of the protections of New York State law, Compl. ¶¶ 41-42; 2) marketplace lenders with special-purpose charters may give loans at higher interest rates than permitted under New York's interest rate caps and anti-usury laws, id. ¶ 43; 3) entities that acquire fintech charters may become exempt from existing federal standards of safety and soundness, liquidity and capitalization, id. ¶ 46; and 4) DFS's operating expenses are funded by assessments levied against New York State-licensed financial institutions, and every firm that receives an OCC charter in place of a New York license deprives DFS of resources, id. ¶ 47.

These alleged injuries will only become sufficiently imminent to confer standing once the OCC makes a final determination that it will issue SPNB charters to fintech companies. In the absence of a "Fintech Charter Decision," DFS's purported injuries are too future-oriented and speculative to constitute an injury in fact.

19

While "certainly impending" injury is sufficient for standing, as DFS conceded at oral argument, none of its alleged injuries will actually occur if the OCC never issues an SPNB charter to a fintech company.  Oral Arg. Tr. at 3:11-13.

Plaintiff's argument that the States are accorded "special solicitude" for standing purposes, relying on the Supreme Court's decision in Massachusetts v. EPA, 549 U.S. 497, 518-26 (2007), does not change this conclusion.  The "special solicitude" standard does not relieve a State plaintiff from its obligation to establish a concrete injury.  Delaware Dep't of Nat. Res. & Envtl. Control v. FERC, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009) ("This special solicitude does not eliminate the state petitioner's obligation to establish a concrete injury . . . .") (emphasis in original); see Massachusetts v. EPA, 549 U.S. at 521-23 (analyzing whether State plaintiff's purported injury-in-fact is actual or imminent after finding that the State is entitled to "special solicitude").

Nor are we persuaded by plaintiff's references to Wyoming v. United States, 539 F.3d 1236, 1242 (10th Cir. 2008), and Alaska v. U.S. Dep't of Transp., 868 F.2d 441, 443 (D.C. Cir. 1989) for the proposition that federal regulatory action that preempts state law creates a sufficient injury in fact.  Plaintiff here cannot point to any regulatory action already taken by the OCC that preempts state law.  Any allegation of preemption at this point relies on speculation about the OCC's future actions.  By contrast, in the

cases cited by plaintiff, a federal agency had informed the States explicitly and directly that federal law preempted specific provisions of state law that the States sought to enforce.  See Wyoming, 539 F.3d at 1241-44; Alaska, 868 F.2d at 442-43.

Because plaintiff does not identify a cognizable injury in fact, defendants' motion to dismiss for lack of standing is granted.

**D. Ripeness**

The ripeness doctrine requires courts to limit their jurisdiction to causes of action that "present a real, substantial controversy, not a mere hypothetical question." National Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 687 (2d Cir. 2013) (internal quotation marks omitted).  Claims are not ripe if they depend on the occurrence of contingent future events that may never occur at all.  Id.  "The doctrine's major purpose is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  Id. (internal quotation marks omitted).

There are two forms of ripeness:  constitutional and prudential.  Simmonds v. INS, 326 F.3d 351, 356-57 (2d Cir. 2003). Constitutional ripeness is "a specific application of the actual injury aspect of Article III standing."  Walsh, 714 F.3d at 688. It prevents a court from deciding an issue of law "in a vacuum" until the resolution of an actual dispute requires it.  Simmonds,

326 F.3d at 357.  On the other hand, prudential ripeness is a discretionary tool a court may employ when it determines "that the case will be <u>better</u> decided later and that the parties will not have constitutional rights undermined by the delay." <u>Id.</u> (emphasis in original).  It allows courts to "avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." <u>Id.</u>

Since constitutional ripeness is a subset of the injury-in-fact element of Article III standing, our constitutional ripeness analysis here is coterminous with our standing analysis above. <u>See</u> <u>Walsh</u>, 714 F.3d at 688 ("Constitutional ripeness . . . is really just about the first <u>Lujan</u> factor – to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'"); <u>New York Civil Liberties Union v. Grandeau</u>, 528 F.3d 122, 130 n.8 (2d Cir. 2008).

Prudential ripeness is assessed based on a two-part inquiry: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 149 (1967); <u>Grandeau</u>, 528 F.3d 122, 131-32.[5]

---

[5]    In <u>Susan B. Anthony List v. Driehaus</u>, 134 S. Ct. 2334, 2347 (2014) ("SBA List"), Justice Thomas questioned, without deciding, "the continuing vitality

Here, plaintiff's claims are unripe because they are "contingent on future events that may never occur," namely the decision by the OCC to issue SPNB charters to fintech companies. See Grandeau, 528 F.3d at 132. Until such a decision occurs, these claims are "directed at possibilities and proposals only, not a concrete plan which has been formally promulgated and brought into operation." Isaacs v. Bowen, 865 F.2d 468, 477 (2d Cir. 1989).

The Second Circuit's framework for its ripeness analysis in Simmonds, 326 F.3d 351, is instructive. There, the Second Circuit assessed whether by waiting for the occurrence of a future event to render a decision, the court would: (1) increase the chance that the proper law is applied to petitioner's claims; (2) reduce the chance of multiple proceedings; and (3) save the court from issuing a decision that may turn out to be unnecessary. Id. at 359.

All three of these factors favor finding that plaintiff's claims here are not prudentially ripe. By waiting for a final

---

of the prudential ripeness doctrine." Until the prudential ripeness doctrine is actually rejected by the Supreme Court, we are bound to follow Abbott Labs. and decades of precedent confirming the doctrine's vitality. See Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 485 (1989) (advising lower courts to "leav[e] to this Court the prerogative of overruling its own decisions"). This approach is consistent with other courts in this Circuit that have continued to apply the prudential ripeness doctrine after the Supreme Court's decision in SBA List. See, e.g. Neroni v. Zayas, 663 F. App'x 51, 53-54 (2d Cir. 2016) (summary order); Davis v. Kosinsky, 217 F. Supp. 3d 706, 713 (S.D.N.Y. 2016); see also Reddy v. Foster, 845 F.3d 493, 501 n.6 (1st Cir. 2017) (noting that SBA List "cast a measure of doubt upon ripeness's prudential dimensions," but concluding that "[u]nder present law, we may also consider the prudential aspects of ripeness").

"Fintech Charter Decision," we will (1) make certain that we are applying the appropriate federal statutory and regulatory provisions, which may be amended in the interim, <u>see</u> First DFS Letter, p. 4 (by DFS's own account, this is a time of "myriad proposals to revamp the regulatory landscape in Washington . . . and to reshape the OCC"); (2) eliminate the possibility of entertaining a new suit every time the OCC takes another interim step toward a final decision; and (3) save the Court from issuing a decision that may turn out to be unnecessary if the OCC never issues a fintech charter or does so under a different statutory or regulatory framework.

Plaintiff's principal counterargument is that these claims are ripe because they are based on purely legal questions that are eminently fit for judicial review. <u>See</u> <u>United States v. Quinones</u>, 313 F.3d 49, 59 (2d Cir. 2002); <u>Nutritional Health All. v. Shalala</u>, 144 F.3d 220, 227 (2d Cir. 1998); <u>Federal/Postal/Retiree Coal. v. Devine</u>, 751 F.2d 1424, 1426 (D.C. Cir. 1985). While the existence of a "purely legal question" is a factor that supports a finding of ripeness, it is not dispositive. <u>See</u> <u>Nat'l Park Hosp. Ass'n v. Dep't of Interior</u>, 538 U.S. 803, 812 (2003) ("Although the question presented here is a 'purely legal one' . . . we nevertheless believe that further factual development would 'significantly advance our ability to deal with the legal issues presented.'").

Moreover, the "future contingencies" that remain may be determinative of the questions before us.  See Walsh, 714 F.3d 691 (citing Grandeau, 528 F.3d at 132).  Even if the OCC decides to regulate fintech companies by awarding them national charters, it may decide to do so by means other than SPNB charters pursuant to § 5.20(e)(1).  See Exchequer Speech, p. 10.  In sum, the issues presented by DFS's complaint will be better resolved if and when plaintiff can point to a final decision by the OCC to issue fintech charters.

As to ripeness's hardship prong, defendants argue convincingly that plaintiff will not suffer any hardship from delay because any injuries they might suffer are contingent on future actions the OCC may or may not take.  It is well settled law in this Circuit that "[t]he mere possibility of future injury" does not constitute hardship.  See Simmonds, 326 F.3d 351, 360.  Plaintiff does not (and cannot credibly) argue that any immediate hardship would follow from a finding that this case is not ripe.

In a letter dated November 28, 2017, DFS requested that if the Court dismisses this case on the basis of ripeness that it "(1) require the OCC to provide prompt and adequate notice to the Court and the Superintendent if and when a decision is made to accept applications from so-called fintech companies for special purpose charters under 12 C.F.R. § 5.20, and (2) allow the Superintendent to reinstate this case on notice with adequate

opportunity for the issues to be briefed and argued prior to the granting of any application by the OCC."  (ECF No. 26, p. 1.)

Without subject matter jurisdiction, the Court cannot grant the relief requested.  However, the Court suggests that it would be sensible for the OCC to provide DFS with notice as soon as it reaches a final decision given DFS's stated intention to pursue these issues and in consideration of potential applicants whose interests would be served by the timely resolution of any legal challenges.  The Court also refers DFS to the OCC's letter of December 1, 2017, which indicates that (1) any fintech applicant for an SPNB charter is required by 12 C.F.R. § 5.8 to publish a public notice of its filing; and (2) information about any such filing would be available in the OCC's Weekly Bulletin on the OCC website.  (See ECF No. 29.)

### IV.   CONCLUSION

Defendants' motion to dismiss (ECF No. 18) for lack of subject matter jurisdiction is granted without prejudice.  See Katz v. Donna Karan Co., 872 F.3d 114, 121 (2d Cir. 2017) ("[W]hen a case is dismissed for lack of federal subject matter jurisdiction, Article III deprives federal courts of the power to dismiss the case with prejudice.  As a result, where a case is dismissed for lack of Article III standing, as here, that disposition cannot be entered with prejudice, and instead must be dismissed without prejudice.") (internal citations omitted) (emphasis in original).

Having concluded that the Court lacks subject matter jurisdiction in this case, we do not reach defendants' motion to dismiss for failure to state a claim.

Dated:     New York, New York
           December 12, 2017

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE